## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| KEVIN JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-07-0178 |
| | § | |
| FRANCIS DRILLING FLUIDS, LTD., | § | |
| *et al*, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND OPINION

The plaintiff, Kevin Jones, a cleaning technician employed by Francis Drilling Fluids, Ltd., sued TODCO d/b/a TODCO Inc., the Offshore Drilling Company d/b/a TODCO ("TODCO"), Applied Drilling Technologies, Inc. ("ADTI"), BJ Services Company ("BJ Services"), Baker Hughes Incorporated ("Baker Hughes"), and Baker Hughes Oilfield Operations, Inc. d/b/a/ Baker Hughes Drilling Fluids ("Baker Fluids"). Jones alleged that on January 7, 2007, he was injured when he was exposed to sodium hydrochloride liquid while working for Francis Drilling aboard TODCO's RIG 46. Francis Drilling was working as a contractor for ADTI, which in turn was in operating under a contract to provide turnkey drilling services to TODCO, when Jones was injured. ADTI and Francis Drilling were parties to a Master Service Agreement (MSA). Under this agreement, each party agreed to indemnify the other for claims asserted against the other by their respective employees. Each party also agreed to procure insurance for the indemnity obligation and to name the other as an additional insured on their policies. Liberty Mutual Insurance Company provided Francis

Drilling a Comprehensive General Liability (CGL) Policy with a Blanket Additional Insured Endorsement.

Baker Hughes and BJ Services were also working on RIG 46 as contractors for ADTI and had separate MSAs with ADTI. Baker Fluids was a subsidiary of Baker Hughes. BJ Services was also working under a Preferred Supplier Agreement with Baker Hughes. Jones alleged that he was injured when Baker Hughes and/or BJ Services, with TODCO's knowledge, dumped large amounts of sodium hydrochloride liquid in his work area.

TODCO and ADTI filed a third-party complaint against Francis Drilling's insurer, Liberty Mutual, and a cross-claim against Francis Drilling,[1] seeking insurance and indemnification under the MSA between ADTI and Francis Drilling. TODCO and ADTI asserted that the MSA entitled them to indemnification from Francis Drilling and coverage as additional insureds under Francis Drilling's CGL Policy with Liberty Mutual.

Liberty Mutual moved for summary judgment dismissing the third-party complaint filed by TODCO and ADTI on the ground that the MSA between Francis Drilling and ADTI did not apply to the work being done when Jones was injured, so that TODCO and ADTI were not additional insureds under the CGL Policy. In the alternative, Liberty Mutual argues that if the MSA did cover the work, and Francis Drilling had a duty to indemnify TODCO and ADTI and make them additional insureds under the CGL Policy, this violates the Louisiana Oilfield Anti-Indemnity Act and is unenforceable. (Docket Entry No. 108).

---

[1] Jones originally included Francis Drilling as a defendant, but voluntarily dismissed the claim on December 18, 2007. (Docket Entry No. 48).

Francis Drilling has also moved for summary judgment dismissing the cross-claim.  (Docket Entry No. 112).  TODCO, ADTI, BJ Services, Baker Hughes, and Baker Fluids argue that Francis Drilling's summary judgment briefing, which was filed six days after this court's deadline, should be stricken.  TODCO, ADTI, BJ Services, Baker Hughes, and Baker Fluids have moved for summary judgment, arguing that the MSA entitles them to indemnification by Francis Drilling and coverage as additional insureds by Liberty Mutual under the CGL Policy issued to Francis Drilling.  (Docket Entry No. 109).  In response, Liberty Mutual and Francis Drilling argue that BJ Services, Baker Hughes, and Baker Fluids are not entitled to the relief they seek because they did not file a third-party complaint or cross-claim against Liberty Mutual or Francis Drilling.  (Docket Entry No. 115).

Based on the pleadings, the motions, responses, replies, and surresponses and surreplies, this court denies all the summary judgment motions.  Docket call is set for **April 3, 2009**, at **2:00 p.m.**, in Courtroom 11-B.  The reasons are set out below.

I.      **Background**

   A.      **The Insurance and Indemnity Requirements of the MSA Between ADTI and Francis Drilling**

TODCO owns RIG 46, on which Jones's accident allegedly occurred.  TODCO and ADTI were parties to a Daywork Drilling Contract under which ADTI agreed to provide drilling services for work on RIG 46.  Francis Drilling worked as a subcontractor for ADTI to provide rig cleaning services.  Under the MSA between ADTI and Francis Drilling, each party agreed to indemnify and insure the other for personal-injury claims asserted by their

respective employees.  Corporate representatives for Francis Drilling and ADTI explained that ADTI would not do business with Francis Drilling without an MSA in place.  (Docket Entry No. 109, Ex. A at 14–18, 21; No. 122, Ex. A ¶¶ 10, 11).  Under the MSA, each party agreed to procure insurance to support their respective indemnity obligations, and to name the other and their contractors as additional insureds.  ADTI had similar MSAs with BJ Services and Baker Hughes, both of which also worked on RIG 46 as subcontractors for ADTI.  Baker Fluids was a subsidiary of Baker Hughes.

The MSA between ADTI and Francis Drilling expressly provided that Francis Drilling would defend and indemnify ADTI and its contractors against personal-injury claims brought by Francis Drilling's employees, regardless of fault.  The MSA stated:

> Subcontractor shall at all times be responsible for and shall release, protect, and indemnify, defend (including payment of reasonable attorney's fees and costs of litigation) and hold Contractor Group harmless from and against any and all costs, losses, liabilities, claims, demands, causes of action, damages, penalties, judgments and awards of every kind and character, without limit and without regard to the cause or causes thereof or the negligence or fault of any party or parties (including without limitation the active, passive, concurrent or solely negligent acts or omissions of any member of Contractor Group) arising in connection herewith . . . in favor of the officers, directors, employees, agents, consultants, servants, representatives or invitees of subcontractor or subcontractor's subcontractors on account of sickness, bodily injury, death or damage to or loss of property.

(Docket Entry No. 108, Ex. D § 9.1).  The MSA defined "Contractor Group" to include "Contractor's other Contractors and other parties contracting with Contractor (excepting Subcontractor and Subcontractor's Subcontractors).  (*Id.*, Ex. D § 9.6(a)(2)).  "Contractor's

4

other Contractors" were defined as "Contractor's other contractors and subcontractors, at any tier, other than Subcontractor and Subcontractor's subcontractors, providing goods and services to Contractor in conjunction with the work or services performed by Contractor for its Customer or Client."  (*Id.*, Ex. D § 1.1(a)).

The MSA required that Francis Drilling carry comprehensive general liability insurance providing "coverage for premises/operations, independent contractors, blanket contractual liability specifically covering the obligations assumed by Subcontractor under this Master Agreement and/or the applicable Work Order and products/completed operations coverage."  (*Id.*, Ex. D-C § 4.0(B)(1)).  The MSA stated that "[a]ll policies of insurance . . . shall be endorsed to name each member of Contractor Group as an Additional Insured, but only as respects and to the extent of liabilities assumed by Subcontractor under this Master Agreement and/or the applicable Work Order."  (*Id.*, Ex. D-C § 6.0).

The MSA also contained a choice-of-law provision stating that maritime law or Texas law governed:

> All rights, obligations, and liabilities of the parties and the provisions of this Master Agreement and the Work Orders shall be exclusively determined, interpreted, litigated and construed in accordance with United States General Maritime Law; provided, however, that if there is no applicable law, then the laws of the State of Texas, excluding any conflicts of law or choice of law rules that would apply the laws of another jurisdiction.

(*Id.*, Ex. D § 19.0).

To fulfill its obligations under the MSA, Francis Drilling obtained a CGL Policy from Liberty Mutual.  The effective dates were September 1, 2006 to September 1, 2007.  The CGL Policy contained a Blanket Additional Insured Endorsement, which stated that additional insureds under the Policy included "any person or organization for whom you have agreed in writing to provide liability insurance." (Docket Entry No. 109, Ex. C, Endorsement 22).  The coverage applied to "coverage and minimum limits of insurance required by the written agreement, but in no event exceeds either the scope of coverage or the limits of insurance provided by this policy." (*Id.*).

## B.    The Scope of the MSA

RIG 46 was a floating drill barge rig.[2]  At the time of Jones's alleged accident, RIG 46 was located in a marsh approximately 30 to 40 minutes by boat up the Intercoastal Canal from Morgan City, Louisiana.  (Docket Entry No. 116, Ex. A at 54–55).  An invoice for the work performed confirmed that RIG 46 was located in Bayou Carlin in St. Mary Parish, Louisiana, within five miles of the Intercoastal Canal.  (Docket Entry No. 108, Ex. C at 27–28; No. 109, Ex. B-3).  The crew traveled to the rig by boat.  It is undisputed that RIG 46 was in inland waters.

---

[2] Jones referred to the barge as a "jack-up rig," (Docket Entry No. 108, Ex. A at 47), which is a "floating rig with legs" that can be lowered and secured to create a drilling platform, and later removed to permit the rig to be towed to a new site. *See, e.g., Demette v. Falcon Drilling Co.*, 280 F.3d 492, 495 (5th Cir. 2002).  At the March 4, 2009 hearing held to permit the parties to present oral argument on the motions, counsel for Francis Drilling clarified that RIG 46 was a floating barge, not a jack-up rig.  Barge rigs and jack-up rigs are "vessels" within the meaning of admiralty law. *Id.* at 498 n.18.

Liberty Mutual and Francis Drilling argue that the MSA does not apply to the work Jones was doing when he was injured because it was not "offshore" work.  The MSA is entitled: "Master Services Agreement (Worldwide Operations – Offshore)."  The initial paragraphs stated:

> WHEREAS, CONTRACTOR [ADTI], its subsidiary and affiliated companies are engaged in the business of drilling offshore wells in all areas of the world through the use of vessels designated as mobile offshore drilling units ("MODUs"); and

> WHEREAS, SUBCONTRACTOR [FRANCIS DRILLING], its subsidiary and affiliated companies are engaged in the business of providing services and/or equipment in connection with the drilling of offshore wells on MODUs in all areas of the world; and

> WHEREAS, CONTRACTOR [ADTI], its subsidiary and affiliated companies desire to retain and SUBCONTRACTOR [FRANCIS DRILLING], its subsidiary and affiliated companies desires to perform certain services and/or provide equipment in conjunction with the drilling of offshore wells using a MODU as provided for in an applicable Work Order; and

> > WHEREAS, the performance of the Work by Subcontractor will be conducted primarily upon and in the furtherance of the mission of such vessels . . . .

(Docket Entry No. 108, Ex. D at 1).  The MSA did not define "offshore."

The MSA also stated that work done under its provisions should be performed under a "Work Order."  The MSA defined "work orders" to include oral directions.  Although such

directions were to be reduced to writing, the failure to do so would not make the MSA

inapplicable.  The MSA stated:

> All oral work orders shall be promptly reduced to writing and
> countersigned by the parties as soon as practicably possible . .
> .  however failure to do so shall not prejudice the application of
> the Master Agreement with respect to any Work undertaken by
> SUBCONTRACTOR pursuant to the oral work order.

(*Id.*, Ex. D § 1.1(e)).

The MSA stated that its indemnification and insurance provisions applied "only as

respects and to the extent of liabilities assumed by the SUBCONTRACTOR under this

Master Agreement and/or the applicable Work Order."  (*Id.*, Ex. D-C § 6.0).

There is no written work order in the record for the work that Francis Drilling was

performing on RIG 46 when Jones was allegedly injured.  There is an invoice that describes

the work.  (Docket Entry No. 109, Ex. A at 27–28, Ex. B-3).  That invoice reflects that

Francis Drilling's work on RIG 46 in Bayou Carlin involved "cleaning services @ location

to clean (3) reserve, (1) slugging, (2) active, (1) settling, (4) sand traps, & (1) trip tank." (*Id.*,

Ex. B-3).  The invoice charged ADTI for 44 hours of work done by a "3 man cleaning crew

(inland)."  *Id.*

A corporate representative for Francis Drilling, Barry Charpentier, testified in his

deposition that "in his opinion," the work reflected by the invoice was not covered by the

MSA because the MSA "was for offshore work" and the invoice did not reflect offshore

work.  Charpentier did not negotiate, draft or execute the MSA.  (*Id.*, Ex. A at 30–31).

Charpentier based his opinion on the preliminary paragraph in the MSA stating "[w]hereas,

8

contractor, its subsidiary, and affiliated companies desire to perform certain services and/or provide equipment in conjunction with the drilling of offshore wells." (*Id.*, Ex. A at 29–30). At the same time, Charpentier testified that "in order for us to do – perform services for oil and gas companies, our customers, we have to have an MSA in place.  They will not allow us to work for them without that being in place." (*Id.*, Ex. A at 13).  There is no document in the record other than the MSA that could apply to the work Francis Drilling was doing on RIG 46 when Jones was injured.  The record contains a declaration by Peggy Jennings, senior contracts administrator for ADTI, stating that Francis Drilling was performing work on RIG 46 pursuant to the MSA between ADTI and Francis Drilling.  (Docket Entry No. 109, Ex. B, ¶ 10).

Liberty Mutual and Francis Drilling seek summary judgment that the MSA only applied only to "offshore" work and therefore did not apply to the accident at issue, which occurred on an inland waterway.  As a result, according to Liberty Mutual and Francis Drilling, the indemnification and insurance provisions of the MSA do not apply. Alternatively, Liberty Mutual argues that those provisions are void under Louisiana law. Each of these issues, and whether BJ Services, Baker Hughes, and Baker Fluids may move for summary judgment, are examined below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the

absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

    If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

    When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory

allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

## III.    Analysis

### A.    Did the MSA Apply to the Work Francis Drilling Was Doing When Jones Was Injured?

The MSA is titled "Master Services Agreement (Worldwide Operations – Offshore)" and states in the initial paragraphs that it applies to "the drilling of offshore wells using a MODU [Mobile Offshore Drilling Unit]."  The MSA does not define the term "offshore" or place it in context.  Liberty Mutual and Francis Drilling argue that "'offshore' is a term of art within the oil and gas industry[ that] specifically refers to a location in the Gulf of Mexico and not inland," (Docket Entry No. 121 at 3), and that the MSA did not apply to work on a barge rig located in a marsh 30 to 40 minutes up the Intercoastal Canal from Morgan City, Louisiana, (Docket Entry No. 108 at 11).  The third-party defendants counter that the MSA does not state that it applies only or exclusively to offshore work.  They point to the fact that the MSA states that the "performance of the Work by Subcontractor [Francis Drilling] will

11

be conducted *primarily* upon and in the furtherance of the mission of such vessels."[3]  (*Id.*,

Ex. D at 1) (emphasis added).  The third-party plaintiffs also argue that

> [d]rilling 'offshore' could mean only drilling in the open seas in
> salt water, but it could just as easily mean drilling off of, or
> away from, *any* shore, in *any* water, fresh, brackish, or salt, just
> so long as the drilling did not take place *on* the shore, beach, or
> the river bank, *i.e., on land*. . . . the mere fact that RIG 46 was
> not in the Gulf of Mexico at the time of Jones's alleged accident
> does not mean that Jones, as Francis's employee, was not doing
> work covered by the Master Services Agreement.

(Docket Entry No. 116 at 10–11).  The third-party plaintiffs urge that "[a]t the very least, the

word 'offshore' creates an ambiguity, which leaves a question for the fact finder," to be

resolved using parol evidence.  (*Id.* at 11).

　　What a contract means, and whether a contract is ambiguous, are questions of law for

the court.  *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).  If the

contract can be given a certain or definite legal meaning or interpretation, then it is not

ambiguous, and a court should construe the contract as a matter of law.  *SAS Inst., Inc. v.

Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).  A court should construe an unambiguous

contract according to the plain meaning of its express words.  *Lyons v. Montgomery*, 701

---

　　[3] The parties dispute the proper interpretation of the word "primarily."  The third-
party plaintiffs urge that the word "primarily" indicates that the MSA also encompasses work
done on items other than "offshore" drilling units.  "As the MSA itself only provides that the
work which it covers will be conducted 'primarily,' i.e., not exclusively, on 'mobile offshore
drilling units,' it does not exclude work on inland barges from its scope."  (Docket Entry No.
116 at 9).  Liberty Mutual responds that "[i]t does not necessarily follow that the parties
contemplated any work other than offshore work, because a subcontractor could still perform
offshore work that is not in furtherance of the mission of MODUs."  (Docket Entry No. 121
at 2–3).  Neither of the parties' interpretations defines "offshore."

S.W.2d 641, 643 (Tex. 1985).  Unambiguous contracts are enforced as written.  *Heritage*, 939 S.W.2d at 121.

A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.  *Id.*  An ambiguity does not arise simply because the parties offer opposing interpretations.  *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).  A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003).  Parol evidence is not admissible for the purpose of creating an ambiguity.  *See Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 517, 243 S.W.2d 154, 157 (Tex. 1951); *Lewis v. E. Tex. Fin. Co.*, 136 Tex. 149, 146 S.W.2d 977, 980 (1941). If a contract is determined to be ambiguous, then a court may consider extraneous evidence to ascertain the true meaning of the instrument.  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  The meaning of an ambiguous contract is a question of fact.  *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980).  Substantially similar rules of contract interpretation apply under maritime law, *see Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555–56 (5th Cir. 2004), and Louisiana law, *see Miller v. Miller*, --- So 2d. ---, 2009 WL 80997, at **2–3 (La. App. 2d Cir. 2009).

Both sides have submitted extrinsic evidence on the meaning of the term "offshore." Liberty Mutual and Francis Drilling assert that "offshore" is a term of art, pointing to federal oil and gas pipeline safety regulations that define "offshore" as "mean[ing] beyond the line

of ordinarily low water along that portion of the coast of the United States that is in direct contact with the open seas and beyond the line marking the seaward limit of inland waters." 49 C.F.R. §§ 191.3., 192.3, 195.2. These regulations are not referred to in the MSA. Liberty Mutual and Francis Drilling do not explain why federal regulations on pipeline safety apply to a contract for servicing a mobile drilling vessel. Liberty Mutual and Francis Drilling do not point to any other industry definition of the term "offshore."

Liberty Mutual and Francis Drilling also cite the testimony of Barry Charpentier, Francis Drilling's corporate representative. Charpentier stated that he had not been in involved in negotiating or executing the MSA. He concluded, based on his interpretation of the initial recital paragraphs, that it only covered "offshore" work and would not apply to the work reflected on the invoice because it was not on an "offshore" rig. (Docket Entry No. 109, Ex. A at 30–31). Charpentier also testified in his deposition, however, that Francis Drilling could not work for ADTI without an MSA in place, and that those parties had no other agreement besides the MSA. (*Id.*, Ex. A at 13, 31). This testimony supports the conclusion that the parties' objective intent was for the MSA to apply to the work that Francis Drilling performed for ADTI on RIG 46 in Bayou Carlin. Charpentier further testified that under the MSA, Francis Drilling had to indemnify ADTI for Jones's injury, and that he knew of no reason why Liberty Mutual would have denied ADTI's indemnity claim. (Docket Entry No. 109, Ex. A at 18–21). Charpentier's testimony is conflicting and limited to his opinion. It does not provide a sufficient basis to conclude that, as a matter of law, the

14

MSA did not apply to the work Francis Drilling was doing for ADTI when Jones was injured.

At the March 4, 2009 hearing held to permit the parties to present oral argument on the motions, Liberty Mutual and Francis Drilling also argued that because there was no written work order for the work Francis Drilling performed for ADTI on RIG 46 in Bayou Carlin, it was not work done under the MSA.  (Docket Entry No. 126).  The argument is based on the provisions of the MSA stating that work done under the MSA should be set out in a written work order.  (Docket Entry No. 108, Ex. D § 1.1(e)).  But the MSA recognized the possibility of oral work orders, and specifically stated that the failure to reduce a work order to writing "shall not prejudice the application of the Master Service Agreement with respect to any Work undertaken by SUBCONTRACTOR pursuant to the oral work order." (*Id.*).  The absence of a written work order is not evidence that the MSA did not apply to the work Francis Drilling was doing for ADTI when Jones was injured.

The third-party plaintiffs have submitted evidence of ADTI's and Francis Drilling's course of dealings.  Peggy Jennings, the senior contracts administrator at ADTI, stated in a declaration that ADTI would not have permitted Francis Drilling to work on RIG 46 without an MSA in place, and that the MSA at issue "was the only [MSA] concerning marine drilling activities currently in effect between Francis Drilling . . . and ADTI at the time of Jones's alleged injury."  (Docket Entry No. 122, Ex. A ¶¶ 8–9).[4]  Jennings added that "ADTI uses

---

[4]  Liberty Mutual argued that this court should reject an earlier version of Jennings's declaration, (Docket Entry No. 116, Ex. C), because it was undated, did not contain a

the same form of [MSA] as it entered into with Francis Drilling Fluids regardless of whether the work is to be performed in connection with a mobile offshore drilling unit, an inland drilling barge, or any other type of marine equipment." (*Id.*, Ex. A ¶ 11). The third-party plaintiffs attach as exhibits the MSAs that ADTI had in place with BJ Services and Baker Hughes for work on RIG 46. Both are substantially similar to the MSA with Francis Drilling. Both are titled "Master Services Agreement (Worldwide Operations – Offshore)," and both contain recitals referring to "offshore" work. (Docket Entry No. 109, Exs. B-4, B-5). This evidence, considered in conjunction with Charpentier's testimony, supports the conclusion that the term "offshore" could encompass the work that Francis Drilling performed on RIG 46 in Bayou Carlin.

Both sides bring to this court's attention *Greenhill Petroleum v. Mike Hicks Tools & Serv's Inc.*, No. 92-3938, 1994 WL 24239, at *2 (E.D. La. Jan. 19, 1994). In *Greenhill*, the court rejected the third-party plaintiff's argument that a cross-claim defendant had breached its contractual obligation to provide excess insurance coverage for "operations in offshore waters" because the well operations at issue had occurred in Timbalier Bay, "in inshore waters." *Id.* Liberty Mutual and Francis Drilling point to the fact that the court seemed to construe the term "offshore" as distinct from "inland" as a matter of law. But, as the third-party plaintiffs point out, the court went on to add that "[e]ven assuming that one could

---

description of her job, and did not indicate that it was based upon personal knowledge, as required by 28 U.S.C. § 1746 and Federal Rule of Civil Procedure 56(e)(1). (Docket Entry No. 121 at 5). The third-party plaintiffs responded by attaching an amended declaration that remedied these defects. (Docket Entry No. 122, Ex. A).

construe the contract terms to mean any state waters, whether inland or offshore, that ambiguity of construction raises a question of material fact as to the meaning of the terms of the contract."  *Id.*

The MSA does not define the term "offshore."  Although the dictionary definition of "offshore" is "off the shore of," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1990), the record shows that it could reasonably mean either off the coast – as in the Gulf of Mexico – or simply off the shore, which would include an inland waterway such as Bayou Carlin, in which RIG 46 was located.  The record is insufficient to resolve the issue as a matter of law.  The motions for summary judgment that ask this court to determine the applicability of the MSA to the work at issue are denied.

### B.  Are the Indemnification Provisions of the MSA Invalid under Louisiana Law?

In an earlier opinion in this case, this court concluded that the CGL Policy was governed by Louisiana law.  The CGL Policy was issued in Louisiana to Francis Drilling, a Louisiana corporation with its principal place of business in Louisiana, to cover Louisiana risks.  (Docket Entry No. 107 at 10–15).  Liberty Mutual and Francis Drilling argue that if the CGL Policy is governed by Louisiana law, the MSA must also be governed by Louisiana law.  They reason that "[b]ecause an analysis of third-party plaintiffs' claim requires consideration of the combined effect of the CGL Policy and the MSA, it would create unnecessary confusion to apply different law to interpret these two agreements."  (Docket Entry No. 121 at 7).  Liberty Mutual and Francis Drilling also argue that Louisiana has a

strong public policy interest in the application of its law to the MSA.  The third-party plaintiffs counter that the MSA's choice-of-law provisions specify the application of maritime or Texas law, and that even in the absence of the choice-of-law provision, maritime law should govern because the MSA is a maritime contract.

If Louisiana law applies to the MSA, the indemnification provisions are invalid under the Louisiana Oilfield Anti-Indemnity Act ("LOAIA").  The statute provides, in relevant part, as follows:

> Any provision in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence of fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

La Rev. Stat. 9:2780(B).  The LOAIA invalidates additional insured coverage based on indemnification agreements on the same principle:

> Any provision in any agreement arising out of the operations, services, or activities listed in Subsection C of this Section . . . which requires waivers of subrogation, additional named insured endorsements, or any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.

La. Rev. Stat. 9:2780(G).  The statute explains its purpose:

> It is the intent of the legislature . . . to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification,

18

> for death or bodily injury to persons, where there is negligence
> or fault (strict liability) on the part of the indemnitee, or an agent
> or employee of the indemnitee, or an independent contractor
> who is directly responsible to the indemnitee.

La. Rev. Stat. 9:2780(A).

Liberty Mutual and Francis Drilling argue that the indemnification and insurance provisions of the MSA are "'null and void' under the Act[ ] because [they] 'frustrate[ ]' or 'circumvent[ ]' the Act's purpose of prohibiting certain types of indemnity agreements, like the one contained in the MSA." (Docket Entry No. 108 at 14); *see also Babineaux v. McBroom Rig Bldg. Serv., Inc.*, 806 F.2d 1282, 1283–84 (5th Cir. 1987) (affirming summary judgment invalidating additional insured coverage because it arose from obligations in an MSA that was null and void under the LOAIA). Liberty Mutual and Francis Drilling assert that if Louisiana law applies, the LOAIA invalidates the MSA's indemnity and insurance provisions because the MSA covers the provision of personnel services to an oil rig. *See Stoot v. Fluor Drilling Servs., Inc.*, 851 F.2d 1514, 1518–20 (5th Cir. 1988) (the LOAIA applies to catering services supplied to an oil rig); *Copous v. Odeco Oil & Gas Co.*, 835 F.2d 115, 116–17 (5th Cir. 1988) (the LOAIA applies to a contract to renovate the living quarters on an oil rig).

The LOAIA applies only if Louisiana law governs the MSA. Liberty Mutual and Francis Drilling recognize that the MSA's choice-of-law clause specifies that maritime, or alternatively, Texas, law applies. Liberty Mutual and Francis Drilling cite *Roberts v. Energy Development Corp.*, 235 F.3d 935 (5th Cir. 2000), for the proposition that, as a matter of

Louisiana public policy, Louisiana law should apply because so many aspects of the MSA are connected to Louisiana. These contacts include the place of incorporation and principal place of business of one of the contracting parties, the place of the incident at issue, and the domicile of the injured worker. (Docket Entry No. 121 at 9–10). Although the MSA at issue in *Roberts* had a choice-of-law clause that specified maritime law or Texas law, the Fifth Circuit concluded that the MSA should be governed under Louisiana law and that the LOAIA applied.

*Roberts* is distinguishable. The MSA in that case applied to, and the accident involved, a fixed oil rig. As a matter of law, a fixed oil rig is not a vessel, and maritime law cannot apply absent stipulation. See *Verdin v. ENSCO Offshore Co.*, 104 F. Supp. 2d 682, 686 (W.D. La. 2000), *aff'd,* 255 F.3d 246 (5th Cir. 2001) ("The parties do not dispute that maritime law would not apply absent the contractual choice of law clause . . . because ENSCO 23 is a fixed platform which the jurisprudence has consistently held not to be a vessel."). The *Roberts* suit was filed in Louisiana federal court, so the court was required to apply Louisiana choice-of-law rules. Those rules required the court to consider whether the choice-of-law clause in the MSA would contravene Louisiana's strong public policy. La. Civ. Code art. 3540. The court concluded that the choice-of-law provision contravened the public policy represented by the LOAIA and that Louisiana law should govern the MSA. *Roberts*, 235 F.3d at 938–943. The other two cases that Liberty Mutual cites, *Verdin v. ENSCO*, 104 F. Supp. 2d at 686–88, and *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 631–32 (5th Cir. 1986), had similar facts.

20

In the present case, by contrast, the MSA governs work done on mobile drilling units – "vessels" – rather than fixed drilling platforms.[5]  Barge rigs like RIG 46 are vessels under maritime law.  *See Thibodeaux v. Vamos Oil & Gas Co.*, 487 F.3d 288, 294 (5th Cir. 2007); *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498 n.18 (5th Cir. 2002).  If the MSA is a "maritime contract," maritime law applies.  A maritime contract "is one that . . . relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment."  1 Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 3-10 (4th ed. 2004).  The Fifth Circuit applies a two-step test for determining whether a contract is maritime contract.  *See Demette*, 280 F.3d at 500.  The first step of the inquiry asks whether the MSA is of the type that has historically been treated by the jurisprudence as a maritime contract.  The second step of the inquiry examines the specific facts of the case.  "For some categories of contracts," however, "the historical treatment is sufficiently clear that the [second step, the] fact-specific inquiry[,] becomes unimportant."  *Id.*

The MSA is of the type that historically has been treated as a maritime contract.  It secures the performance of services and the provision of equipment "in conjunction with the drilling of offshore wells using a [mobile offshore drilling unit]," and contemplates that these

---

[5]  A "threshold issue" in determining whether maritime law applies to a contract is whether the contract "is associated with a fixed offshore platform or a floating structure of some type."  1 Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 309 (4th ed. 2004).  This distinction applies despite the fact that it "may be artificial and arbitrary because the work performed on a fixed structure is often identical to the work performed aboard a movable rig."  *Id.*

activities "will be conducted primarily upon and in the furtherance of the mission of such vessels."  (Docket Entry No. 108, Ex. D at 1).  The MSA is among the "well established" types of contracts that are traditionally treated as maritime in nature.  These include "contracts to furnish services, supplies, or accessories" to a vessel and contracts "involving the use of a vessel to perform . . . oil and gas drilling operations."  *See* Schoenbaum, ADMIRALTY AND MARITIME LAW § 3-10; *see also Thibodeaux*, 487 F.3d at 294 ("[P]ersonnel contracts for [inland drilling] barges are historically treated as maritime contracts."); *Demette*, 280 F.3d at 500 ("[C]ircuit precedent virtually compels the conclusion that" a personnel contract for a jack-up rig "is  a maritime contract."); *see also Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332 (5th Cir. 1981).  The MSA is a maritime contract.

Under *Demette*, the MSA's status as a traditional maritime contract obviates the need to examine the second, fact-specific step of the test, 280 F.3d at 500.  This second step nevertheless confirms the conclusion that maritime treatment is appropriate.  The second step of the test involves a six-prong "fact-specific inquiry" that includes:

> 1) What does the specific work order in effect at the time of the injury provide?
> 2) What work did the crew assigned under the work order actually do?
> 3) Was the crew assigned to do work aboard a vessel in navigable waters?
> 4) To what extent did the work being done relate to the mission of the vessel?
> 5) What was the principal work of the injured worker?
> 6) What work was the injured worker actually doing at the time of the injury?

280 F.3d at 500–01.  Although there was no written work order in place when Jones was injured, (Docket Entry No. 109, Ex. A at 34), the parties do not dispute that Jones was performing his assigned work of "clean[ing] the drilling fluids or the mud tanks" of a "barge rig" in the water.  (*Id.*, Ex. A at 25).  The work invoice also shows cleaning work.  (*Id.*, Ex. B-3).

At the March 4, 2009 hearing, Liberty Mutual and Francis Drilling argued that because the third-party plaintiffs had not shown that the marsh in which Jones's accident occurred was navigable, the MSA was therefore not a maritime contract.  (Docket Entry No. 126).  This argument misstates the nature of the jurisdictional test.  "[T]he boundaries of admiralty jurisdiction over contracts – as opposed to torts or crimes – [are] conceptual rather than spatial."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004).  If the contract is maritime in nature, then the fact the fact that the event giving rise to a claim under that contract did not occur in a maritime area does not defeat the maritime nature of the contract.  *Id.* at 24–25 (a contract action arising from a railway accident was governed by maritime law, because the primary objective of the contract under which the goods at issue were shipped was maritime in nature: the transport of goods by sea from Australia to the east coast of the United States); *see also Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5th Cir. 1990) (whether a contract is a maritime contract depends on the "nature and character of the contract, rather than on its place of execution or performance").  In this case, the MSA involves the provision of personnel and services to mobile drilling vessels.  It is, in nature and character, a maritime contract.  Furthermore, although a marsh that is "non-navigable, shallow, and vegetation-

23

choked" may not be "navigable water," *see In re Destiny Drilling (USA), Inc.*, 184 F.3d 816, 1999 WL 499533, at *1 (5th Cir. 1999) (unpublished), there is evidence in this case the part of the marsh where the rig was located was navigable.  In *Destiny Drilling*, the stipulated facts showed that the marsh was non-navigable and that an air boat had to be used to travel the marsh.  In the present case, by contrast, the evidence is that Francis Drilling's personnel traveled to RIG 46 by crew boat, a type of vessel that operates in navigable waters.  (Docket Entry No. 116, Ex. A at 55–56; Docket Entry No. 108, Ex. B at 23).

The MSA is a maritime contract.  In maritime contracts, "[i]n the absence of a choice of law clause, the construction of indemnity provisions . . . is governed by maritime law." *Dupre v. Penrod Drilling Corp.*, 993 F.2d 474, 476 n.4 (5th Cir. 1993) (quoting *Stoot v. Fluor Drilling Servs., Inc.*, 851 F.2d at 1517).  In this case, the MSA specifies maritime law. Under maritime law, indemnification and insurance provisions like those contained in the MSA are valid.  *See Devon La. Corp. v. Petra Consultants, Inc.*, 247 F. App'x 539, 546 (5th Cir. 2007); *Hoda v. Rowan Cos.*, 419 F.3d 379, 383 (5th Cir. 2005); *Johnson v. Seacor Marine Corp.*, 404 F.3d 871, 877 (5th Cir. 2005); *Thierot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir. 1986).

Liberty Mutual's and Francis Drilling's motion for summary judgment that they are not obligated to indemnify or insure the third-party plaintiffs because the MSA is void under the LOAIA is denied.

**C.**   **May BJ Services, Baker Hughes, and Baker Fluids Move for Summary Judgment Against Liberty Mutual and Francis Drilling?**

Liberty Mutual and Francis Drilling argue that BJ Services, Baker Hughes, and Baker Fluids may not seek or obtain summary judgment.  Unlike TODCO and ADTI, they did not file a third-party complaint seeking a declaratory judgment.  As a result, according to Liberty Mutual and Francis Drilling, they cannot seek or obtain summary judgment that they are entitled to declaratory relief.  Because this court denies summary judgment as to all claims, this argument is denied as moot.

### D.    Should Francis Drilling's Motion for Summary Judgment Be Stricken As Untimely?

Francis Drilling filed its motion for summary judgment on December 18, 2008, six days after the December 12, 2008 deadline.  The third-party plaintiffs argue that this motion should be stricken for lateness.  (Docket Entry No. 118).  Because this court denies summary judgment as to all claims, this argument is denied as moot.

## IV.    Conclusion

The cross-motions for summary judgment are denied.  Docket call is set for **April 3, 2009**, at **2:00 p.m.**, in Courtroom 11-B.

SIGNED on March 17, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

25