**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| KEVIN JONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-07-0178 |
| | § | |
| FRANCIS DRILLING FLUIDS, LTD., | § | |
| *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER ENTERING FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

I.     **Background**

This lawsuit arises out of the exposure by the plaintiff, Kevin Jones, to the fumes of an allegedly toxic concentration of a sodium hypochlorite solution.  The incident occurred while Jones was working as a cleaning technician for Francis Drilling Fluids, Ltd., a Louisiana oilfield service company that provides industrial cleaning services to barges, vessels, tanks, and other equipment. Jones was working for Francis Drilling on RIG 46, a drilling barge owned by TODCO d/b/a TODCO Inc., the Offshore Drilling Company d/b/a TODCO ("TODCO").  The barge was near the Intercoastal Canal in Louisiana on January 7, 2007, when the incident occurred.

Francis Drilling was a contractor for Applied Drilling Technologies, Inc. ("ADTI"), which in turn was in operating under a contract to provide turnkey drilling services to TODCO, when Jones was injured.

BJ Services Company ("BJ Services") was working under a contract with ADTI to provide filtration services to RIG 46.

Baker Hughes Incorporated ("Baker Hughes") and Baker Hughes's subsidiary, Baker Hughes Oilfield Operations, Inc. d/b/a/ Baker Hughes Drilling Fluids ("Baker Fluids"), were working under a contract with ADTI to provide completion fluid engineering services to RIG 46.

ADTI and Francis Drilling were parties to a Master Services Agreement ("MSA"). Under this MSA, each party agreed to indemnify the other for claims asserted against the other by their respective employees. Each party also agreed to procure insurance for the indemnity obligation and to name the other as an additional insured. ADTI had similar MSAs with BJ Services and Baker Hughes.

Liberty Mutual Insurance Company provided Francis Drilling a Comprehensive General Liability (CGL) Policy with a Blanket Additional Insured Endorsement and a Total Pollution Exclusion.

Jones sued Francis Drilling, TODCO, ADTI, BJ Services, Baker Hughes, and Baker Fluids. Of these defendants, TOCDO, ADTI, BJ Services, Baker Hughes, and Baker Fluids (the "third-party plaintiffs") filed third-party claims against Liberty Mutual, asserting coverage as additional insureds under the CGL Policy that Francis Drilling obtained from Liberty Mutual. (Docket Entry No. 157). The third-party plaintiffs filed cross-claims against Francis Drilling for indemnification under the MSA between Francis Drilling and ADTI. (Docket Entry No. 156). BJ Services and Baker Hughes also cross-claimed against ADTI for indemnification under the MSA between Francis Drilling and ADTI. (Docket Entry Nos. 86, 87). Liberty Mutual and Francis Drilling filed cross-claims against BJ Services and Baker Hughes for indemnification under the "pollution or contamination" provision of BJ Services's and Baker Hughes's MSAs with ADTI. This provision required BJ Services and

2

Baker Hughes to indemnify ADTI and its other subcontractors for "pollution or contamination" caused by materials under their control. (Docket Entry Nos. 166, 169).

Jones dismissed his claims against Francis Drilling early in the case. On April 30, 2009, Jones settled his claim against the third-party plaintiffs for $145,000. Without reaching a final determination as to who would ultimately be responsible for paying the settlement amount, Liberty Mutual advanced $55,000, Francis Drilling advanced $65,000, and the third-party plaintiffs advanced $25,000.

This court has denied two motions for summary judgment filed by Liberty Mutual and Francis Drilling. In the first motion, Liberty Mutual contended that the CGL Policy was governed by Texas law, and that under Texas law, the Total Pollution Exclusion in the CGL Policy would bar coverage for Jones's accident. (Docket Entry No. 78). This court concluded that the CGL Policy was governed by Louisiana law, and that under Louisiana law, fact issues remained as to whether the Total Pollution Exclusion applied. (Docket Entry No. 107). In the second summary judgment motion, Liberty Mutual and Francis Drilling contended that they had no insurance or indemnification obligations to the third-party plaintiffs because the MSA, which applied to "offshore" work, did not apply to the work that Francis Drilling was performing on RIG 46 because it was stationed in inland Louisiana waters when Jones was injured. Liberty Mutual and Francis Drilling also argued that they had no insurance or indemnification obligations to the third-party plaintiffs because the MSA was governed by Louisiana law and indemnification provisions are void under the Louisiana Oilfield Anti-Indemnity Act ("LOAIA"). (Docket Entry No. 109). This court concluded that there were disputed fact issues material to determining whether the MSA applied to work done on inland waters, including the Louisiana marsh where RIG 46 was located when Jones

was injured.  This court also concluded that the MSA was governed by maritime law, under which its insurance and indemnification provisions were valid.  (Docket Entry No. 127).

On June 16, 2009, this court held a bench trial on the third-party plaintiffs' claims against Liberty Mutual and Francis Drilling for insurance and indemnification; BJ Services's and Baker Hughes's cross-claims against ADTI for indemnification; and Liberty Mutual's and Francis Drilling's cross-claims against BJ Services and Baker Hughes for indemnification.  The parties presented testimony on the insurance and indemnification issues from Peggy Jennings, the senior contracts administrator for ADTI; Darrell Miller, an onboard supervisor for ADTI who was on RIG 46 when the accident occurred; Barry Charpentier, the corporate representative for Francis Drilling Fluids; and Brad Lemoine, a pilot for Francis Drilling.  The parties also presented deposition testimony from the following individuals:  Kevin Jones, the plaintiff; Joseph Spots, a Francis Drilling employee who was Jones's "hole watch" when the accident occurred; Paul Domingues, a BJ Services filtration technician who admitted to pouring the sodium hypochlorite solution that injured Jones; Justin Knox, a Baker Hughes completion fluids engineer, who suggested that Domingues pour the sodium hypochlorite solution into a filter unit; and Rhonda Regan, a claims service analyst for Louisiana Companies, Francis Drilling's insurance broker.  This court heard testimony as to attorneys' fees by David R. Walker and Marion McDaniel, counsel for the third-party plaintiffs.  The parties also submitted an extensive documentary record, including the CGL Policy and the MSAs.

Based on the pleadings, the parties' submissions, the evidence, the arguments of counsel, and the applicable law, this court enters the following findings of fact and conclusions of law:[1]

---

[1]  To the extent any of the conclusions of law is a finding of fact, it should be considered as a finding of fact. To the extent any of the findings of fact is a conclusion of law, it should also be considered as a conclusion

- Francis Drilling is required to indemnify the third-party plaintiffs under its MSA with ADTI.

- The CGL Policy that Francis Drilling obtained from Liberty Mutual provides coverage for the indemnification owed the third-party plaintiffs, and that coverage is not barred by the Total Pollution Exclusion in the CGL Policy.  The third-party plaintiffs are entitled to coverage as additional insureds under the CGL Policy.

- BJ Services and Baker Hughes are entitled to indemnification by ADTI under their MSAs with ADTI.

- Liberty Mutual and Francis Drilling are not entitled to indemnification by BJ Services and Baker Hughes based on the "pollution or contamination" clause in the MSAs between BJ Services and ADTI and Baker Hughes and ADTI.

- Liberty Mutual and Francis Drilling are not liable for the fees and expenses that the third-party plaintiffs incurred pursuing their indemnification claims.

- Liberty Mutual and Francis Drilling are liable for a total of $164,035, including the $25,000 that the third-party plaintiffs advanced to settle Jones's claim and the $125,000 in attorneys' fees and $14,035 in expenses that the third-party plaintiffs incurred defending against Jones's claim.

By **August 31, 2009**, the third-party plaintiffs must file a statement with this court explaining how the amount they will recover from Liberty Mutual is to be allocated, with a proposed final judgment if appropriate.

_____

of law.

5

The reasons for these rulings, and the detailed findings of fact and conclusions of law, are explained below.

## II.      Factual Background

### A.      The Parties

TODCO, now called Hercules Offshore, Inc., is a Delaware corporation with its principal place of business in Houston, Texas.  TODCO is a leading provider of offshore contract drilling, liftboat services, and inland barge services.  TODCO has operations in ten countries on four continents.  It claims to operate the world's largest inland barge drilling fleet.[2]  Between February 25, 2008 and January 1, 2009, TODCO completed 13 incident reports for environmental incidents, including three that required environmental cleanup or remediation.

ADTI is a Texas corporation with its principal place of business in Texas.  It advertises itself as "the world's premier turnkey drilling contractor."[3]  As a turnkey drilling contractor, ADTI contracts to drill wells on a fixed-price basis.  ADTI has performed turnkey contract work on wells all over the world, including the Gulf of Mexico, Latin America, the North Sea, the Middle East, and West Africa, using "more than 100 different rigs from all the major drilling contractors," including

---

[2]  *See* Hercules Offshore, *Hercules Offshore Drilling*, http://www.herculesoffshore.com/drilling.html (last visited July 24, 2009).    The website also includes a diagram of a posted barge.    *See* http://www.herculesoffshore.com/pdfs/Posted%20Barge%20Drawing.pdf (last visited July 24, 2009). Liberty Mutual has cited to the TODCO/Hercules website as an exhibit admitted into evidence. (Liberty Mutual Trial Binder, Ex. 25).

[3]  Turnkey drilling service is a "type of financing arrangement for the drilling of a wellbore that places considerable risk and potential reward on the drilling contractor.  Under such an arrangement, the drilling contractor assumes full responsibility for the well to some predetermined milestone . . . . Until this milestone is reached, the operator owes nothing to the contractor.  The contractor bears all risk of trouble in the well, and in extreme cases, may have to abandon the well entirely and start over.  In return for assuming such risk, the price of the well is usually a little higher than the well would cost if relatively trouble free.  Therefore, if the contractor succeeds in drilling a trouble-free well, the fee added as contingency becomes profit." Schlumberger, *Oilfield Glossary*, at http://www.glossary.oilfield.slb.com/Display.cfm?Term=turnkey (last visited July 24, 2009).

"offshore and inland barge rigs."[4]  ADTI does not do any projects on land; all its turnkey drilling projects are done on water.

BJ Services is a Delaware corporation with its principal place of business in Texas.   The company offers numerous wellbore services, including cementing, completion tools, filtration services, production chemicals, sand control, and wellbore cleaning.[5] BJ Services's website explains the filtration services it offers:  "Proper wellsite maintenance of high-value completion fluids is a key element to a cost-effective well completion.  Filtration that is not properly sized and specifically selected for well conditions can allow damaging solids to contact the formation and increase reclamation costs for higher density fluids. . . . BJ's professional team of trained specialists have the ability to identify your filtration problems and design a system for the specific application."[6] ADTI hired BJ Services to provide filtration services on RIG 46.

Baker Hughes is a Delaware corporation with its principal place of business in Texas.  Baker Hughes operates in over 90 countries and "serves the worldwide oil and natural gas industry with reservoir consulting and products and services for drilling, formation evaluation, completion and production."[7]  Baker Hughes offers a wide range of well-completion services.  Baker Fluids, also a Delaware corporation with its principal place of business in Texas, is a subsidiary of Baker Hughes.

---

[4]  *See* ADTI, *Introduction*, http://www.applieddrillingtechnology.com/ (last visited July 24, 2009).  Liberty Mutual cited the ADTI website in an exhibit admitted into evidence.  (Liberty Mutual Trial Binder, Ex. 24).

[5]  *See* BJ Services, *Completion Services*, http://www.bjservices.com/website/index.nsf/P&S?openframeset (last visited July 24, 2009).  Liberty Mutual cited the BJ Services website in an exhibit admitted into evidence.  (Liberty Mutual Trial Binder, Ex. 74).

[6]  *See* BJ Services, *Filtration Services*, http://www.bjservices.com/website/index.nsf/P&S?openframeset (last visited July 24, 2009).

[7]  *See* Baker Hughes, *About Baker Hughes*, http://investor.shareholder.com/bhi/about_bakerhughes/about.cfm (last visited July 24, 2009).  Liberty Mutual cited to the Baker Hughes website in an exhibit admitted into evidence.  (Liberty Mutual Binder, Ex. 73).

Baker Fluids offers a "full range of specialty fluid products," including "high performance water- and emulsion-based systems." Baker Fluids also offers technical support services.[8] Baker Fluids was hired by ADTI to provide completion-fluid engineering services on RIG 46.

Francis Drilling is a Louisiana corporation with its principal place of business in Louisiana. Francis Drilling is an oilfield service company in the business of providing drilling fluids and related services, such as barge, vessel, tank, equipment, and industrial cleaning. The services Francis Drilling provides can be performed on land, on fixed platforms, on barge rigs, or on offshore rigs and vessels. Francis Drilling advertises that its cleaning services include a "fluids recycling system," which ensures that "there is no waste disposal associated with the cleaning of supply vessels that contain remnants of water based, diesel based, synthetic based muds, and selective completion fluids."[9] ADTI hired Francis Drilling to clean the sand traps and mud pits on RIG 46. Francis Drilling used a barge to bring its cleaning supplies, which included a "vacuum truck" or "Supervac" and a large toolbox with steam cleaners and miscellaneous equipment, to RIG 46.

Liberty Mutual is a Massachusetts corporation with its principal place of business in Boston; it also does business in Texas. Liberty Mutual is an insurer that offers a "full suite of risk and disability management—and risk transfer products and services" to businesses of all sizes.[10] Liberty Mutual issued Francis Drilling a Commercial General Liability Policy ("CGL Policy") effective

---

[8] *See* Baker Hughes, *Drilling Fluids*, http://www.bakerhughesdirect.com/cgi/bhdf/resources/ExternalFileHandler.jsp?path=private/BHDF/Products_Services/DrillingFluids/index.html&bookmarkable=Yes&channelId=-3000093 (last visited July 24, 2009).

[9] *See* Francis Drilling Fluids, *Cleaning Services*, http://www.fdfltd.com/CleaningServices.asp (last visited July 24, 2009).

[10] *See* Liberty Mutual, *Insurance for Business*, http://www.libertymutualgroup.com/omapps/ContentServer?pagename=LMGroup/Views/LMG&ft=2&fid=1138356633293 (last visited July 24, 2009).

between September 1, 2006 and September 1, 2007.  The policy was issued in Louisiana through a Louisiana broker.

### B.      The MSA and Work Orders Between ADTI and Francis Drilling

TODCO and ADTI were parties to a Daywork Drilling Contract under which ADTI agreed to provide drilling services for work on RIG 46 to drill and complete a well in Bayou Carlin, St. Mary Parish, Louisiana.  (TODCO Trial Binder, Ex. 8).  Francis Drilling worked as a subcontractor for ADTI on RIG 46 to provide cleaning services.  ADTI and Francis Drilling were parties to a Master Services Agreement ("MSA"), effective August 13, 2003, under which each party agreed to indemnify and insure the other for personal-injury claims asserted by their respective employees. Under the MSA, ADTI and Francis Drilling each agreed to get insurance to support their respective indemnity obligations and to name the other party and its contractors as additional insureds. Corporate representatives for ADTI and Francis Drilling testified that ADTI would not do business with Francis Drilling without an MSA in place.  There were no other MSAs in place between ADTI and Francis Drilling when Jones was injured.

The MSA between ADTI and Francis Drilling was entitled: "Master Services Agreement (Worldwide Operations – Offshore)."  The initial paragraphs stated:

> WHEREAS, CONTRACTOR [ADTI], its subsidiary and affiliated companies are engaged in the business of drilling offshore wells in all areas of the world through the use of vessels designated as mobile offshore drilling units ("MODUs"); and
>
> WHEREAS, SUBCONTRACTOR [FRANCIS DRILLING], its subsidiary and affiliated companies are engaged in the business of providing services and/or equipment in connection with the drilling of offshore wells on MODUs in all areas of the world; and
>
> WHEREAS, CONTRACTOR [ADTI], its subsidiary and affiliated companies desire to retain and SUBCONTRACTOR [FRANCIS DRILLING], its subsidiary and affiliated companies desires to

9

> perform certain services and/or provide equipment in conjunction with
> the drilling of offshore wells using a MODU as provided for in an
> applicable Work Order; and
>
> WHEREAS, the performance of the Work by Subcontractor will be
> conducted primarily upon and in the furtherance of the mission of such
> vessels . . . .

(TODCO Trial Binder, Ex. 7 at 1).  The MSA did not define "offshore."  Jennings, ADTI's senior contracts administrator, testified that ADTI used the term "offshore" to include "off the coast of the Gulf or inland waters."

The August 13, 2003 cover letter that accompanied the MSA for Francis Drilling to sign stated that ADTI "require[d] this agreement of our subcontractors to perform services or provide equipment on our offshore Turnkey wells."  (Liberty Mutual Trial Binder, Ex. 16).  Barry Charpentier, the corporate representative for Francis Drilling, testified at trial that he did not understand the term "offshore" to apply to work done on inland waters.  But Charpentier conceded that in his deposition, he had testified that he understood that the MSA for "offshore" work required Francis Drilling to indemnify ADTI for Jones's accident on RIG 46.  Charpentier also admitted that to his knowledge, no one at Francis Drilling had ever suggested to ADTI that the MSA would not cover the work Francis Drilling performed on inland waters.

The MSA stated that work done under its provisions should be performed under a "Work Order."  The MSA defined "work orders" to include oral directions.  Although such directions were to be reduced to writing, the failure to do so would not make the MSA inapplicable.  The MSA stated:

> All oral work orders shall be promptly reduced to writing and
> countersigned by the parties as soon as practicably possible . . .
> however failure to do so shall not prejudice the application of the
> Master Agreement with respect to any Work undertaken by
> SUBCONTRACTOR pursuant to the oral work order.

10

(TODCO Binder, Ex. 7 § 1.1(e)).  The record contains no written work orders between ADTI and

Francis Drilling for the work Francis Drilling was doing on RIG 46 when Jones was injured, or for

any other project Francis Drilling did for ADTI.  Charpentier testified that Francis Drilling had done

"quite a lot of work for ADTI for inland water locations and offshore water locations" with no written

work orders.

     The record contains numerous invoices that Francis Drilling sent ADTI, many for projects

on inland waters.  (TODCO Trial Binder, Ex. 13).  One invoice, dated January 24, 2007, describes

the work that Francis Drilling was performing when Jones was injured.  (*Id.*, Ex. 12).  That invoice

states that Francis Drilling's work on RIG 46 in Bayou Carlin involved "cleaning services @ location

to clean (3) reserve, (1) slugging, (2) active, (1) settling, (4) sand traps, & (1) trip tank."  (*Id.*).  The

invoice charged ADTI for 44 hours of work done by a "3 man cleaning crew (inland)."  (*Id.*).

     The MSA between ADTI and Francis Drilling stated that Francis Drilling would defend and

indemnify ADTI and its contractors against personal-injury claims brought by Francis Drilling's

employees, regardless of fault.  The MSA stated:

> Subcontractor shall at all times be responsible for and shall release,
> protect, indemnify, defend (including payment of reasonable
> attorney's fees and costs of litigation) and hold Contractor Group
> harmless from and against any and all costs, losses, liabilities, claims,
> demands, causes of action, damages, penalties, judgments and awards
> of every kind and character, without limit and without regard to the
> cause or causes thereof or the negligence or fault of any party or
> parties (including without limitation the active, passive, concurrent or
> solely negligent acts or omissions of any member of Contractor
> Group) arising in connection herewith . . . in favor of the officers,
> directors, employees, agents, consultants, servants, representatives or
> invitees of subcontractor or subcontractor's subcontractors on account
> of sickness, bodily injury, death or damage to or loss of property.

(TODCO Trial Binder, Ex. 7 § 9.1).  The MSA defined "Contractor Group" to include ADTI and

"Contractor's other Contractors and other parties contracting with Contractor (excepting

Subcontractor and Subcontractor's Subcontractors)." (*Id.*, Ex. 7 § 9.6(a)(2)). "Contractor's other Contractors" were defined as "Contractor's other contractors and subcontractors, at any tier, other than Subcontractor and Subcontractor's subcontractors, providing goods and services to Contractor in conjunction with the work or services performed by Contractor for its Customer or Client." (*Id.*, Ex. 7 § 1.1(a)). The MSA stated that its indemnification and insurance provisions applied "only as respects and to the extent of liabilities assumed by the Subcontractor under this Master Agreement and/or the applicable Work Order." (*Id.*, Ex. 7-C § 6.0).

The MSA required Francis Drilling to obtain comprehensive general liability insurance providing "coverage for premises/operations, independent contractors, blanket contractual liability specifically covering the obligations assumed by Subcontractor under this Master Agreement and/or the applicable Work Order and products/completed operations coverage." (*Id.*, Ex. 7-C § 4.0(B)(1)). The MSA stated that "[a]ll policies of insurance . . . shall be endorsed to name each member of Contractor Group as an Additional Insured, but only as respects and to the extent of liabilities assumed by Subcontractor under this Master Agreement and/or the applicable Work Order." (*Id.*, Ex. 7-C § 6.0).

The MSA also contained a choice-of-law provision, as follows:

> All rights, obligations, and liabilities of the parties and the provisions of this Master Agreement and the Work Orders shall be exclusively determined, interpreted, litigated and construed in accordance with United States General Maritime Law; provided, however, that if there is no applicable law, then the laws of the State of Texas, excluding any conflicts of law or choice of law rules that would apply the laws of another jurisdiction.

(*Id.*, Ex. 7 § 19.0).

## C.     Francis Drilling's CGL Policy with Liberty Mutual

12

To fulfill its obligation under the MSA, Francis Drilling obtained Commercial General Liability Policy No. TB1-641-005206-036 (the "CGL Policy") from Liberty Mutual. (TODCO Trial Binder, Ex. 19).  The effective dates were September 1, 2006 to September 1, 2007.  Under the CGL Policy, Liberty Mutual promised to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages."  (*Id.*, Ex. 19, endorsement 26).  The CGL Policy stated that "[s]olely for purposes of liability assumed in an 'insured contract,' reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of 'bodily injury,' provided . . . [that] [s]uch attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged."  (*Id.*, Ex. 19 at 2).

The CGL Policy contained a Blanket Additional Insured Endorsement, which stated that additional insureds under the Policy included "any person or organization for whom you have agreed in writing to provide liability insurance."  (*Id.*, Ex. 19, endorsement 22).  Additional insureds were covered for liability arising out bodily injury arising out of "your [Francis Drilling's] work."  (*Id.*).  "Your work" was defined as "[w]ork or operations performed by you or on your behalf."  (*Id.*, Ex. 19 at 15).  The coverage was to be for the "minimum limits of insurance required by the written agreement," but "in no event exceeds either the scope of coverage or the limits of insurance provided by this policy."  (*Id.*, Ex. 19, endorsement 22).

The CGL Policy contained the following "Total Pollution Exclusion":

        f.      Pollution

(1)    "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

(2)    Any loss, cost or expense arising out of any:

    (a)    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

    (b)    Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

(*Id.*, Ex. 19, endorsement No. 9).

The CGL Policy defined "pollutants" as follows:

15.    "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

(*Id.*, Ex. 19 § 15).

**D.    The MSAs Between ADTI and BJ Services and Baker Hughes**

ADTI also had MSAs with BJ Services and Baker Hughes, both of which also worked on RIG 46 as subcontractors for ADTI.  The MSAs with BJ Services and Baker Hughes were similar to the MSA between ADTI and Francis Drilling.  The documents were also titled "Master Services Agreement (Worldwide Operations–Offshore)," and the recitals of these MSAs also referred to work on "offshore" wells using mobile offshore drilling units.  (TODCO Trial Binder, Exs. 9, 10).  The

insurance and indemnification provisions were also similar.  (*Id.*).  The MSAs included provisions

that BJ Services and Baker Hughes would indemnify and insure against "pollution or contamination"

that they caused:

> Subcontractor shall at all times be responsible for, shall release, and shall protect, indemnify, defend (including payment of reasonable attorney's fees and costs of litigation) and hold contractor group harmless from and against any and all costs (including without limitation, costs of investigation, litigation, and court costs), interest, losses, liabilities, claims, demands, causes of action, damages, penalties, suits (including appeal), judgments, fines, expenses (including without limitation, reasonable attorneys' fees), and awards of every kind and character (collectively, "claims"), arising in connection herewith:
> . . . .
>
> > (c) from pollution or contamination (including without limitation the control and/or removal thereof) which originates from subcontractor group's equipment, or materials under the control of subcontractor or subcontractor's subcontractor, including but not limited to fuels, lubricants, motor oils, pipe dope, paints, solvents, garbage or debris.

(TODCO Trial Binder, Ex. 10 § 9.1(c)).[11]  An identical provision is contained in the ADTI/Francis

Drilling MSA.  (*Id.*, Ex. 7 § 9.1(c)).

Like the ADTI/Francis Drilling MSA, the ADTI/BJ Services MSA and ADTI/Baker Hughes

MSA contained choice-of-law provisions designating maritime law or Texas law if no maritime law

applied.  (*Id.*, Ex. 9 § 19.1, Ex. 10 § 19.1).  The ADTI/BJ Services MSA also specified that "any

---

[11]  The "pollution or contamination" clause in the ADTI/Baker Hughes MSA varies slightly, stating that it applies only to pollution or contamination that occurs "while the equipment or materials are above the surface of the land or water."  (TODCO Trial Binder, Ex. 9 § 9.1(c)).  The parties do not dispute that Jones's accident occurred above the water's surface.

dispute, controversy or claim arising out of or in connection with" the MSA "shall be settled by arbitration under the UNCITRAL Arbitration Rules." (*Id.*, Ex. 10 § 19.2).[12]

The record contains a written work order between ADTI and BJ Services. The work order is dated July 1, 2006 and states that it applies to work done between July 1, 2006 and June 30, 2007. The work order applies "to the performance of all work and services, and the supplying of goods, tools, equipment, machines, appliances, parts, material or supplies" to "various" vessels in the "United States Gulf of Mexico and adjacent state waters." The work is described as "Cement Services and any other Work requested by CONTRACTOR and accepted by SUBCONTRACTOR." The work order provides that "all work and services" performed under the work order are covered under the MSA. (Liberty Mutual Trial Binder, Ex. 20).

The record also contains a written work order between ADTI and Baker Hughes. The work order is dated July 1, 2006 and states that it applies to work done between July 1, 2006 and June 30, 2007. The work order provisions are identical to those in the work order with BJ Services, except that the work described is "Shorebase Facilities, MWD/LWD, Wireline Logging, Mudlogging, Mud Products, Completion Fluids, Completion Products, Completion Services, Directional Drilling, Purchase of Tangible Products, the services associated with the above and any other Work requested by CONTRACTOR and accepted by SUBCONTRACTOR." The ADTI/Baker Hughes work order states that "all work and services" performed under the work order are covered under the MSA.

### E.    The Nature and Location of RIG 46

TODCO's RIG 46 is a type of "inland barge" known as a "posted barge." An inland barge is a submersible drilling structure that can be positioned over the drill site and sunk so its hull rests

---

[12]  None of the parties has raised the arbitration clause.

on the floor of the body of water.  A posted barge is an inland barge with the hull and superstructure separated by 10 to 14 foot columns, which increase the rig's water-depth capabilities.[13]  RIG 46 is 198 feet long, 54 feet tall, can navigate in water that ranges in depth from 8 to18 feet, and can drill to a depth of 25,000 feet.  RIG 46 could be sunk by filling compartments at the bottom with water.  RIG 46 has quarters for 43, including galley, mess hall, bath facilities, changing room, laundry, staterooms, and offices.  (TODCO Trial Binder, Ex. 8 at 18–19).

When Jones was injured, RIG 46 was located at the Charles M. Peterson, Jr. Well No. 1 in Bayou Carlin, an inland marsh in St. Mary Parish, Louisiana.  The well was located in a dead-end canal slip approximately 1,700 feet off of the Intercoastal Canal.  The slip was no more than 8 feet deep.  Approximately 20,634 cubic yards of the canal strip had to be dredged before RIG 46 could be pulled into place by tugboat.  The dredged part of the canal was "non-vegetated waterbottoms." (Liberty Mutual Trial Binder, Ex. 62).

RIG 46 did not have navigational aids, a navigational crew, or a captain.  It could not self-propel.  At the time of the accident, RIG 46 had been sitting on the bottom of the marsh at the Peterson well site.  RIG 46 remained there for almost one year.  While at the Peterson well site, RIG 46 was serviced by crew boats and supply boats that navigated up the Intercoastal Canal.  Workers on RIG 46 reached it by crew boat, in a 30- to 40-minute trip up the Intercoastal Canal from the

---

[13] *See* Hercules Offshore, *About Hercules Offshore*, http://www.herculesoffshore.com/about_expertise.html (last visited July 24, 2009); *see also* William C. Lyons *et al.*, STANDARD HANDBOOK OF PETROLEUM AND NATURAL GAS ENGINEERING 6-424 (2d ed. 2005) ("Because the barge rig was limited to very shallow depths, a posted barge was developed with the drilling deck separated from the barge by I-beams supporting the drilling deck.  With this unit, the barge could be sunk completely below the surface of the water as long as the drilling deck was above the water."); United States Dep't of the Interior, Minerals Mgmt. Serv., *Offshore Mineral Management Glossary*, at http://www.mms.gov/glossary/po-pv.htm (last visited July 24, 2009) (A posted barge is "a mobile submersible drilling structure consisting of a barge hull that rests on the bottom, steel posts that rise from the top of the barge hull, and a deck that is built on top of the posts, well above the waterline.  It is used to drill wells in water no deeper than about 30–35 feet.  Most posted barge submersibles work in inland gulfs and bays.").

Baker Hughes dock in Morgan City.  (Liberty Mutual Depo. Binder, Ex. 1 at 54–55).  Francis

Drilling's crew worked on RIG 46 on a "week on, week off" basis.  (*Id.*, Ex. 1 at 48).  ADTI's Darrell

Miller testified that the work done on RIG 46 at the Peterson well site was a "zero discharge"

operation—no components of the job were allowed to go overboard into the canal, and everything

had to stay contained on the rig.

### F.    Jones's Injury

On January 7, 2007, Jones was in "Tank 4," a "sand trap," using a "supersucker" to clean oil-

based drilling mud out of the trap.  The oil-based mud had been used to drill the well.  That mud had

to be removed from the trap before the well-completion phase, so that completion fluid could be

pumped into the well.  Tank 4 was a five-by-six-foot room with a slanting roof that was six feet tall

at its highest point.  Jones could stand up straight only in the highest parts of the sand trap and

otherwise had to bend or crouch.  The sand trap was filled with eight to twelve inches of oil-based

mud, which Jones was cleaning out.  (*Id.*, Ex. 1 at 96–101).

The fumes that sickened Jones came from approximately three gallons of a chemical called

"W.O. Break" that Paul Domingues, a BJ Services filtration technician, had poured into the "possum

belly" of "shaker 3," an apparatus above the sand trap.  (*Id.*, Ex. 1 at 103–07; Ex. 4 at 35).  A

"possum belly," also known as a "distribution box" or "flowline trap," is a metal container located

at the head of the shaker that receives and slows the flow of drilling fluid before it reaches the shale

shaker.  A shale shaker is a vibrating screen used to remove impurities from circulating drilling fluid.

Shaker 3 was connected by a four-to-five foot trough or "flow line" to the Tank 4 sand trap.  (*Id.* at

107–08; TODCO Depo. Binder, Ex. C at 28–30).  A sand trap is a small pit, located just after the

shaker screens, used as a settling pit to separate coarser solids that accidentally bypass the shale

shakers.[14]      Domingues did not know that anyone was in the sand traps when he poured the W.O.

Break solution into the "possum belly." He also believed that the valves connecting the shakers with

the sand traps were closed.  (TODCO Depo. Binder, Ex. C at 38–39).  Those valves, however, would

frequently leak.  (Liberty Mutual Depo. Binder, Ex. 2 at 37).

Jones testified that when the fumes from the W.O. Break entered the sand trap, which he had

been cleaning for an hour to an hour-and-a-half, his "throat and nose started to burn." He "got dizzy,

started gagging and coughing and had to get out of the tank." (*Id.*, Ex. 1 at 100–01).[15]  A TODCO

incident report made that day states that "[w]hile cleaning out sand trap pit, Baker Hughes Intec

Drilling Fluids W.O. Break (Sodium Hypochlorite Solution) was poured into shale shaker by Baker

Hughes filtration hand, which was next to man hole, fumes from Sodium Hypochlorite Solution went

down into tank [that] Kevin was working in[.]  [H]e noticed bad smell and taste and got dizzey [sic]

and came out of hole." The report described Jones's injury as "headache, nostrils, throat and chest

burn[;] hard to breath[e]." (Liberty Mutual Trial Binder, Ex. 1).  Jones received a medical evaluation

that day, which reflects that the W.O. Break fumes caused "burning and congestion of the head," a

"raspy" voice, and "head congestion." The record from that evaluation indicates that Jones had "mild

dizziness and a headache," although these symptoms "were resolving." Jones was diagnosed with

"chemical  inhalation  exposure"  and  given  over-the-counter  Claritin,  an  allergy  remedy  and

[14] *See* Schlumberger, *Oilfield Glossary*,
http://www.glossary.oilfield.slb.com/Display.cfm?Term=sand%20trap (last visited July 24, 2009).

[15] Joseph Spots, Jones's "hole watch," who was standing above the sand trap when Jones was injured, also
contends that he began "coughing and gagging" when the W.O. Break was poured.  Spots described the smell
as "rotten egg." (Liberty Mutual Depo. Binder, Ex. 2 at 31).  The parties did not address whether "rotten
eggs" is an accurate description of how W.O. Break fumes smell.  Baker Hughes's Material Safety Data sheet
for W.O. Break describes the odor of the chemical as "chlorine bleach." (Liberty Mutual Trial Binder, Ex.
11 at 3).  Domingues, who poured the W.O. Break, testified that despite being an arms-length away from the
chemical and not wearing a respirator, he did not smell any odor, his eyes did not burn, and he did not become
dizzy.  (TODCO Depo. Binder, Ex. C at 82).

19

decongestant, and over-the-counter Primatene, an asthma remedy, for his symptoms.  Jones was told

that he could return to "[r]egular duty as directed."  (*Id.*, Ex. 33 at 23–24).

Jones received another medical evaluation eight days later.  The record from that evaluation

indicates that Jones "ha[d] improved considerably," that "[h]is breathing ha[d] returned to normal and

his raspy voice ha[d] also returned to normal."  The record notes that Jones complained of occasional

"mild headaches w/ an upset stomach," which Jones attributed to "postnasal drainage," and that Jones

complained of "feel[ing] quite sleepy at times," although at the examination Jones was "fully alert

and d[id] not appear to be in any distress."  (*Id.*, Ex. 33 at 22).

W.O. Break is a 12.5% "sodium hypochlorite solution" comprised of sodium hypochlorite,

sodium hydroxide, and chlorine.  Sodium hypochlorite solution in lower concentrations is commonly

referred to as bleach.  Baker Hughes does not manufacture W.O. Break but supplies it to customers

using the proprietary name "W.O. Break."  A 2008 Material Safety Data Sheet issued by Baker

Hughes states that W.O. Break is "[v]ery toxic to aquatic organisms," "severely irritating to the skin

and may cause burns," "toxic by inhalation" and "may cause severe irritation and burns to the nose,

throat, and respiratory tract."[16]  The Data Sheet also describes W.O. Break as "a water pollutant [that]

should be prevented from contaminating soil or from entering sewage and drainage systems and

bodies of water."  (Liberty Mutual Trial Binder, Ex. 11).  Sodium hypochlorite is classified as a

"hazardous substance" under the Federal Water Pollution Control Act.  40 C.F.R. § 116.4.  It is also

classified as a "hazardous substance" under the CERCLA regulations, with a reportable quantity of

---

[16]  The Occupational Safety and Health Administration requires chemical manufacturers to "obtain or develop a material safety data sheet for each hazardous chemical they produce or import," and requires employers to "have a material safety data sheet in the workplace for each hazardous chemical which they use."  29 C.F.R. 1910.1200(g).  The regulation sets forth the required contents of a material safety data sheet, including the physical and chemical characteristics of the chemical, its physical hazards, health hazards including signs and symptoms of exposure, and exposure limits.  *Id.*

20

100 pounds. 49 C.F.R. § 172.101, App'x A. The CERCLA regulations also define chlorine, another component of W.O. Break, as a "marine pollutant." 49 C.F.R. § 172.101, App'x B. The W.O. Break that caused Jones's injury was not released into the water or onto the land; it was confined to the shaker and tank on RIG 46. Neither TODCO, ADTI, nor any of the subcontractors reported or were required to report Jones's exposure to any environmental agency.

There is conflicting evidence in the record as to why the W.O. Break was used and whether its use was for its intended purpose. Domingues testified that he poured the W.O. Break at the suggestion of Justin Knox, a Baker Hughes employee. According to Domingues, Knox suggested that the W.O. Break could prevent "pills and spacers"—chemicals injected into the well between the drilling fluid and the completion fluid to prevent these fluids from mixing—from plugging up the filtration unit that Domingues was tending. (Liberty Mutual Depo. Binder, Ex. 4 at 27–28). Knox agrees that he told Domingues to use W.O. Break to break up pills and spacers. But according to Knox, Domingues was told to pour the W.O. Break into the filtration unit, not the "possum belly." Knox testified that he did not tell Domingues exactly where to pour the W.O. Break because he "assumed that [Domingues] knew to use it in the filter unit." Knox testified that he had never heard of anybody pouring W.O. Break directly into a "possum belly." (*Id.*, Ex. 5 at 28, 38).[17]

By contrast, Darrell Miller of ADTI testified at trial that W.O. Break is a "cleaner" used "[t]o help clean the pits and tanks." Miller testified that W.O. Break was particularly useful in breaking up the "film" left by oil-based drilling mud on the sand trap walls and in the mud pit. Miller rejected the possibility that W.O. Break was being used on RIG 46 as an aid in filtration or to break up pills

---

[17] Jones testified that he had seen Knox standing beside Domingues at the site where the W.O. Break was poured. (Liberty Mutual Trial Binder, Ex. 1 at 163–64). Domingues testified that no one was next to him when he poured the W.O. Break. (*Id.*, Ex. 4 at 42–44).

and spacers.  Miller testified that BJ Services had a different product, called "D.E.," that was used

for this purpose.  Domingues testified that on prior jobs, he had seen W.O. Break poured into the sand

traps or mud pits, but that the purpose of pouring the W.O. Break into those units was to break up

pills and spacers, and that the W.O. Break would "eventually get to the filter unit."  (Liberty Mutual

Depo. Binder, Ex. 4 at 71–72).

### III.    Liability Under the ADTI/Francis Drilling MSA and the CGL Policy

#### A.    The ADTI/Francis Drilling MSA Applied to the Work Jones Was Performing

The MSA  is titled "Master Services Agreement (Worldwide Operations–Offshore)" and

states in the initial paragraphs that it applies to "the drilling of offshore wells using a MODU [Mobile

Offshore Drilling Unit]."  The MSA does not define the term "offshore."  In an earlier Memorandum

and Order, this court analyzed the MSA and the parties' submissions and concluded that the record

was insufficient to conclude as a matter of law that "offshore" either included or excluded work done

on inland waters.  This court concluded that the term "offshore" was ambiguous and denied the

parties' cross-motions for summary judgment.  (Docket Entry No. 107).  At the bench trial, the

parties presented parol evidence as to the meaning of the term "offshore" in the MSA.

What a contract means, and whether a contract is ambiguous, are questions of law for the

court.  *Heritage Res. Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).  If the contract can be

given a certain or definite legal meaning or interpretation, it is not ambiguous, and a court should

construe the contract as a matter of law.  *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex.

2005).  A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably

susceptible to more than one interpretation.  *Id.*  A court determines whether a contract is ambiguous

by looking at the contract as a whole in light of the circumstances present when the parties entered

the contract.  *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742,

746 (Tex. 2003).  If a contract is determined to be ambiguous, the court may consider extraneous or

parol evidence to determine the meaning.  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d

517, 520 (Tex. 1995).  The meaning of an ambiguous contract is a question of fact.  *Harris v. Rowe*,

593 S.W.2d 303, 306 (Tex. 1980).  "A basic principle of contract interpretation in admiralty law is

to interpret, to the extent possible, all the terms in a contract without rendering any of them

meaningless or superfluous."  *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir.

2004).

        The parol evidence presented as to the meaning of "offshore" in the MSA between ADTI and

Francis Drilling establishes that the MSA applied to the work that Francis Drilling was doing on RIG

46 when Jones was injured.  Francis Drilling could not have done any work for ADTI without an

MSA in place.  The August 13, 2003 cover letter that accompanied the MSA for Francis Drilling to

sign stated that ADTI "require[d] this agreement of our subcontractors to perform services or provide

equipment on our offshore turnkey drilling wells." (Liberty Mutual Trial Binder, Ex. 16).  There was

no other MSA between the parties.  Francis Drilling did a substantial amount of work for ADTI,

including a significant amount of work on inland waters.  ADTI  did no turnkey drilling projects on

land.

        The substantially similar MSAs between ADTI and BJ Services and ADTI and Baker Hughes

support the conclusion that ADTI's MSA was a standard contract that covered all of the work that

its subcontractors performed for it, whether on inland waters or on waters off the coastline.  There

is no evidence that ADTI had any other form MSA that would apply to work on inland waters as

opposed to work offshore, such as in the Gulf of Mexico.  The work orders issued to BJ Services and

Baker Hughes stated that work done under these work orders—including work "in adjacent state

23

waters"—was covered by the MSAs.  This supports the conclusion that the parties contemplated that work on "inland" waters was covered by the MSAs.[18]

The testimony also supported interpreting "offshore" to include both inland waters and waters off the coastline.  Jennings, ADTI's senior contracts administrator, testified that ADTI used the term "offshore" to include "off the coast of the Gulf or inland waters."  Barry Charpentier, the corporate representative for Francis Drilling Fluids, testified at trial that he did not understand the term "offshore" to apply to work done on inland waters.  But Charpentier conceded that in his deposition, he testified that he understood that the MSA for "offshore" work required Francis Drilling to indemnify ADTI for Jones's accident on RIG 46.  Charpentier also admitted that no one at Francis Drilling had ever suggested to ADTI that the work Francis Drilling performed in inland waters would not be covered by the MSA.

This court finds and concludes that the term "offshore" in the MSA between ADTI and Francis Drilling encompassed both inland waters and waters off the coastline.  The MSA applied to the work that Francis Drilling and its employees were performing on RIG 46 on January 7, 2007.  The MSA's reference to "offshore" work does not provide a basis for Liberty Mutual and Francis Drilling to avoid their insurance and indemnity obligations under the MSA.

### B.      The MSA is a Maritime Contract

In the Memorandum and Order issued on the cross-motions for summary judgment, this court concluded that the MSA was a maritime contract, that maritime choice-of-law rules therefore applied, and that under those rules, the MSA's choice-of-law clause that specified the application of maritime

---

[18]   Liberty Mutual asks this court to infer that the work orders between ADTI and BJ Services and Baker Hughes expanded these parties' obligations under the MSAs, but the record does not support this interpretation.  The work orders establish that the parties contemplated that work on "adjacent state waters" was covered by the MSAs.

or Texas law was valid.  This court also concluded that under maritime law, the indemnity obligations in the MSA were valid.  Liberty Mutual and Francis Drilling continue to dispute that the MSA is a maritime contract, arguing that Louisiana law applies and invalidates the indemnification provisions.

The MSA satisfies the two-step test in the Fifth Circuit for determining whether a contract is a maritime contract.  The first step requires a court to ask whether the contract is of the type historically treated  as a maritime contract.  The second step requires a court to examine the specific facts of the case.  *Demette v. Falcon Drilling Co.,* 280 F.3d 492, 500 (5th Cir. 2002).[19]  "For some types of contracts," however, "the historical treatment is sufficiently clear that the [second step, the] fact-specific inquiry[,] becomes unimportant."  *Id.*

Applying this test leads to the conclusion that the MSA is the type of contract historically treated as a maritime contract.  The MSA secures the performance of services and the provision of equipment "in conjunction with the drilling of offshore wells using a [mobile offshore drilling unit]," and contemplates that these activities "will be conducted primarily upon and in the furtherance of the mission of such vessels."  (TODCO Trial Binder, Ex. 7 at 1).  Under maritime law, inland barge rigs like RIG 46 are considered "vessels" and contracts relating to work on such barge rigs have historically been treated as maritime in nature.  *See, e.g., Thibodeaux v. Vamos Oil & Gas Co.*, 487 F.3d 288, 294 (5th Cir. 2007).  The MSA is of the type historically treated as a maritime contract.

The second step of the *Demette* test also supports the conclusion that the MSA is maritime in nature.  The invoice between ADTI and Francis Drilling that described the cleaning work

---

[19]  The facts to be examined include:  "1) What does the specific work order in effect at the time of the injury provide?  2) What work did the crew assigned under the work order actually do?  3) Was the crew assigned to do work aboard a vessel in navigable waters?  4) To what extent did the work being done relate to the mission of the vessel?  5) What was the principal work of the injured worker?  6) What work was the injured worker actually doing at the time of the injury?"  *Demette*, 280 F.3d at 500–01.

performed on the barge rig vessel provided evidence of an oral work order.  Jones was doing this cleaning work when he was injured.  Although RIG 46 was in a marsh, it was very close to the navigable Intercoastal Canal and crew boats were able to navigate the water around RIG 46.   The work done was specifically related to the mission of RIG 46.

Because the MSA is a maritime contract, the choice-of-law clause, which specifies maritime or Texas law, governs.  Under maritime law, the indemnification provisions of the MSA are valid.

During the bench trial, Liberty Mutual and Francis Drilling challenged these findings and conclusions on multiple grounds.  Liberty Mutual and Francis Drilling contended that this court erred in concluding that RIG 46 was a "vessel."  Liberty Mutual and Francis Drilling cited *In re Silver Slipper Casino Venture LLC*, 264 F. App'x. 363, 364–65 (5th Cir. 2008), for the proposition that a vessel moored for a prolonged period and connected to or resting on the water bottom is not a "vessel" under maritime law.  But *Silver Slipper* stands only for the proposition that a casino barge that has been "permanently moored," "was not practically capable of being transported over water," and was moved from its location only because a hurricane ripped the barge free of its steel moorings, was not a "vessel" under maritime law.  The *Silver Slipper* court acknowledged that its holding was limited to cases in which a vessel "has been *permanently* moored or otherwise rendered practically *incapable* of transportation or movement."  The court noted with approval the Supreme Court's recent definition of a "vessel" as "includ[ing] every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  *Id.* at 265–66 (emphasis added) (quoting *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 489 (2005)).

There is no evidence that RIG 46 was permanently moored over the Peterson well or that it was not practically capable of being transported over water.  RIG 46 rested on the bottom of Bayou Carlin for not quite a year.  RIG 46 was designed to rest on the water bottom during each drilling

project and then, when the drilling was complete, rise from the bottom for transportation over water for the next project. *Silver Slipper* is clearly distinguishable.

The facts presented by Jones's accident on RIG 46 are not novel, and the well-settled case law shows that RIG 46 is a "vessel" for purposes of maritime law. "Submersible drilling barge cases are legion and invariably involve injuries occurring while the drilling barge is fixed on the ocean floor and not floating or in movement." *Barger v. Petroleum Helicopters, Inc.*, 692 F.2d 337, 343 n.4 (5th Cir. 1982). "A submersible drilling barge designed to transport drilling equipment to a well site, to submerge for drilling operation, and to refloat for movement to a new site, is a vessel." 1 THOMAS J. SCHOENBAUM *ET AL.*, ADMIRALTY AND MARITIME LAW § 3–6 (4th ed. 2003). A floating submersible rig is a "vessel" for purposes of maritime law even when it is "hard aground" and its "only relation . . . to the sea [i]s its past—when it was towed to a new location—or its future—when it w[ill] again be towed to another location." *Barger*, 692 F.2d at 342 (citing *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959)); *see also Demette*, 280 F.3d 492, 498 n.18 (5th Cir. 2002) ("This circuit has repeatedly held that special-purpose moveable drilling rigs . . . are vessels within the meaning of admiralty law"; rejecting the contention that a drilling rig stops being a "vessel" when it is "temporarily taken out of navigation" and attached to the water bottom for purposes of drilling); *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 n.5 (5th Cir. 1986) (a semisubmersible drilling unit is "indisputably a vessel"). The fact that the hull of RIG 46 rested on the bottom of Bayou Carlin for almost a year during the drilling project is consistent with finding it a "vessel" under maritime law.

Liberty Mutual and Francis Drilling also argue that RIG 46 was not a vessel because it did not have a captain or navigation aids and required a tug boat to position it over the Peterson well. The absence of a captain or navigation aids is not dispositive. In *Manuel v. P.A.W. Drilling & Well*

*Service, Inc.*, 135 F.3d 344, 351 (5th Cir. 1998), the Fifth Circuit rejected the argument that a floating rig was not a "vessel" under maritime law because it lacked "navigational aids; a raked bow; lifeboats and other lifesaving equipment; bilge pumps; crew quarters; and registration with the Coast Guard as a vessel." The court noted that the rig's "transportation function . . . was not merely incidental[, but] . . . was essential to the work it was designed and built to perform. It was a highly mobile, self-contained unit," the mobility of which "allowed it to service wells located in various places on navigable waters." The rig "transported all of the necessary equipment across navigable waters to each location." *Id.* The court concluded that the fact that it "serve[d] as a work platform when stationed over well-heads . . . d[id] not detract from the importance of its transportation function." *Id.* RIG 46 was similarly equipped; it was a drilling rig capable of transporting drilling equipment from site to site over navigable waters. The differences between RIG 46 and the rig in *Manuel* do not support Liberty Mutual's and Francis Drilling's argument. For example, the fact that RIG 46 had living quarters for 43 men is consistent with its vessel status. *See, e.g., Holmes v. Atlantic Sounding Co.*, 437 F.3d 441 (5th Cir. 2006) (a "quarterbarge," an unpowered, floating dormitory that housed employees during dredging projects, was a vessel). The case law establishes that RIG 46 is a vessel.

Liberty Mutual and Francis Drilling also argue that this court erred in failing to construe the MSA in conjunction with the oral work order under which Francis Drilling was operating. They argue that this court did not consider that the work order was for the cleaning of a barge rig sunk to the bottom of a canal, or that the canal itself was surrounded by vegetation and had to be dredged before RIG 46 could navigate into that area of the bayou. This court agrees that the specific work order and nature of work actually performed at the time of the accident should be considered in conjunction with the MSA to determine whether maritime law applies. *See Davis & Sons, Inc. v.*

28

*Gulf Oil Corp.*, 919 F.2d 313, 315–16 (5th Cir. 1990).  This analysis was performed as part of applying the two-step test under *Demette*.  The MSA and the oral work order, taken together, show that the nature of the contract was for Francis Drilling to perform services in furtherance of the barge rig's mission; a barge rig is a vessel under maritime law; personnel contracts for inland drilling barges are historically treated as maritime contracts (*see Thibodeaux*, 487 F.3d at 294); the marsh in which RIG 46 was moored and in which the drilling took place was sufficiently navigable for the vessel to be pulled into place by tug and for crew boats and supply boats to access the vessel directly; and RIG 46 was only 1,700 feet from the navigable Intercoastal Canal.  The oral work order does not provide a basis for reconsidering the finding and conclusion that the MSA was a maritime contract.

Finally, Liberty Mutual and Francis Drilling contend that because ADTI and TODCO took the position in moving to dismiss the Jones Act claim that Jones's work did not serve the mission of the barge, they cannot now change that position.  But under maritime law, the test for what qualifies as a "maritime" tort differs significantly from what constitutes a "maritime" contract.  *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) ("[T]he boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—[are] conceptual rather than spatial.").  The analysis of Jones's tort claim is not the same as the analysis of the contract issues.  There is no judicial estoppel bar to the position that ADTI and TODCO are taking.  And this court did not rule on whether there was a valid Jones Act claim because the parties dismissed that claim by stipulation.  ADTI's and TODCO's position on whether there was a Jones Act claim does not provide a basis for concluding that the MSA or accompanying work order were not maritime in nature.

The MSA is a maritime contract. Louisiana law does not apply to invalidate the indemnification provisions. The MSA does not provide a basis for Liberty Mutual and Francis Drilling to avoid their indemnification obligations.

### C.     Jones's Injury Arose Out of Francis Drilling's Work on RIG 46

Liberty Mutual also contends that the third-party plaintiffs are not entitled to coverage as additional insureds because the CGL Policy provides additional insured coverage only for bodily injury arising out of "your [Francis Drilling's] work." (*Id.*, Ex. 19, endorsement 22). The CGL Policy defines "your work" as the "work or operations performed by you or on your behalf." (*Id.*, Ex. 19 at 15). Liberty Mutual argues that because Jones's injury "was caused solely by the actions and/or work of BJ Services and Baker Hughes/Baker Fluids[, it] did not arise out of Francis' work for ADTI." (Docket Entry No. 206 at 36).

The CGL Policy does not restrict coverage for insured contracts to those bodily injuries arising out of Francis Drilling's work, stating only that Liberty Mutual will pay "those sums that [Francis Drilling] becomes legally obligated to pay." (TODCO Trial Binder, Ex. 19 § 2(b)(2)). Francis Drilling's arguments as to its legal obligation to pay under the MSA were that the MSA did not apply to work done on inland waters and that the MSA's indemnification provisions were invalidated by Louisiana law. This court has already rejected these arguments.

Liberty Mutual's argument as to additional-insured coverage fails. Jones was injured while performing work that was part of what ADTI hired Francis Drilling to do on RIG 46. The invoice described the work as "cleaning services @ location to clean . . . (4) sand traps." (TODCO Trial Binder, Ex. 12). At the time of the accident, Jones was cleaning oil-based drilling mud out of a sand trap. Jones was injured because an employee of another subcontractor on RIG 46 poured approximately three gallons of W.O. Break so that the fumes reached the enclosed area in which

30

Jones was working.  But the CGL Policy does not restrict coverage to work-related injuries to Francis Drilling employees caused by the negligence of other Francis Drilling employees.  The MSA, for which the CGL Policy provided additional insured coverage, made it clear that Francis Drilling employees would be working with employees of other contractors and subcontractors.  The MSA made it clear that Francis Drilling would be required to indemnify these contractors and subcontractors and provide insurance to those contractors and subcontractors for injuries to Francis Drilling's employees.[20]

The cases that Liberty Mutual cites are inapposite.  In *National Hills Shopping Center, Inc. v. Liberty Mutual Insurance Company*, 551 F.2d 655, 661 (5th Cir. 1977), the Fifth Circuit concluded

---

[20] Under maritime law, the Fifth Circuit has "broadly construed language incidental or similar to the "'arising in connection herewith' language . . .  to unambiguously encompass all activities reasonably incident or anticipated by the principal activity of the contract."  *Fontenot*, 791 F.2d at 1215.  The *Fontenot* court explained:

> Any other result would deny the realities of maritime life, particularly life aboard drilling vessels.  Numerous contractors, subcontractors and sub-subcontractors must work together in close quarters, all working toward a common goal but performing diverse tasks.  An activity performed by Contractor A can easily injure Contractor B's employees.  Off-duty or otherwise uninvolved employees are placed at risk by the myriad goings-on no less than the employees who actually perform the drilling, welding, cooking, and so on.  Judicial attempts to determine which injuries occurred "in connection with" which activities are destined to produce unprincipled distinctions and cannot be expended to address the countless possibilities for injuries in the offshore workplace.
>
> This is not to say that the parties cannot contract for a more precise definition of their indemnity obligations, e.g., by defining indemnity obligations according to which party's negligence caused the injury (to the extent permitted by law), or by limiting indemnity obligations to injuries incurred during working hours or during particularized operations, etc.  However, the clear import of our decisions is that, absent more precise language in maritime contracts, we construe broadly "in connection with" and similar terms included in indemnification agreements.

791 F.2d at 1215 n.8. The CGL Policy is governed by Louisiana law, but insured a maritime risk.

that the insurer for a department store that leased space in a shopping center was not obligated to cover the shopping center's owner as an additional insured.  The lessee's premises were damaged when part of the shopping center roof collapsed.  The lessee's insurance policy provided additional insured coverage only for damages "arising out of" the lessee's business.  The court concluded that additional insured coverage was not available because the insured risk was "the business of operating a department store," not the risk of "owning, operating, maintaining and leasing a shopping center." *Id.* at 661.  The court noted that the insurer "did not assume all liabilities for property damage which might befall any person or entity qualifying as an 'insured.'"  For coverage to apply, "the liability must be shown to have resulted from damages arising out of the business of the named insured."  *Id.* In the present case, the insured risk was the provision of cleaning services to an oil rig, including the risk that employees providing such services would be injured by another subcontractor's negligence. Jones was injured while performing this work.  *National Hills Shopping Center* does not support a finding of no coverage.

Liberty Mutual also cites *Laper v. Board of Comm'rs of Port of New Orleans*, 617 So.2d 505, 513 (La. App. 4th Cir. 1993).  In that case, the court concluded that an indemnification clause in an insured contract did not require coverage by the indemnitor's insurer because the clause did not expressly provide coverage for injury arising out of the indemnitee's own negligence.  In the present case, by contrast, the MSA stated that Francis Drilling would "at all times be responsible for . . . and hold Contractor Group harmless from and against any and all costs, losses, liabilities, claims, demands, causes of action, damages, penalties, judgments and awards of every kind and character, *without limit and without regard to the cause or causes thereof or the negligence or fault of any party or parties . . . .*"  (TODCO Trial Binder, Ex. 7 § 9.1 (emphasis added)).

32

In *Gotro v. Town of Melville*, 527 So.2d 568, 570 (La. App. 3d Cir. 1988), another case that Liberty Mutual cites, the court concluded that a sewer construction contractor that had promised to indemnify and insure the town of Melville, Louisiana for damages arising from its performance of sewer construction work did not owe the town coverage as an additional insured.  The plaintiff sued the town and the sewer contractor for injuries she sustained when her pickup truck hit a rut in the street.  The court concluded that the plaintiff's injury did not arise out of the sewer contractor's work because there was no evidence that the contractor had done work in the area where the plaintiff was injured.  In the present case, Jones's injury arose from the work he did for Francis Drilling under the MSA, which contained the indemnification provision.

Jones's injury arose out of Francis Drilling's work on RIG 46.  Liberty Mutual's argument does not provide a basis to deny coverage.

### D.       The Total Pollution Exclusion Does Not Apply

Liberty Mutual contends that the Total Pollution Exclusion in the CGL Policy bars coverage. Francis Drilling and the third-party defendants argue that the Total Pollution Exclusion does not apply.  The evidence showed that Jones was injured through exposure to sodium hypochlorite solution vapors in the Tank 4 sand trap.  There is also evidence that other crew members smelled the vapors, although there is no other evidence of injury to any one besides Jones.  W.O. Break is a chemical used on oil rigs and is considered a pollutant and a hazardous substance.  There is conflicting evidence as to whether the W.O. Break was used for its intended purpose when Jones was injured.  There is no evidence that the W.O. Break was released outside a contained vessel within RIG 46.   The "zero discharge" operation of the rig was maintained.  There is no evidence that TODCO, ADTI, or the subcontractors had to perform any environmental cleanup as a result of the use of WO. Break that led to Jones's injury.

33

In *Doerr v. Mobil Oil Corporation*, 774 So.2d 119 (La. 2000), the Louisiana Supreme Court clarified Louisiana law on the proper interpretation of total pollution exclusions. *Doerr* held that such clauses "w[ere] designed to exclude coverage for environmental pollution only" and cannot be "applied to all contact with substances that may be classified as pollutants." *Id.* at 123, 127–28. The *Doerr* court analyzed the history of total pollution exclusions, observing that such clauses originated in response to federal and state legislation, such as CERCLA, that assigned responsibility for the costs of cleaning up environmental pollution. The exclusions were designed to prevent insureds from shifting the risk of such cleanup costs to their general liability policies. *Id.* at 126–27. The *Doerr* Court concluded that "[a] literal reading of the total pollution exclusions would alter the general scope and expectation of the parties." *Id.* at 127. An insured under a CGL Policy "expect[s] to be insulated generally from liability claims" and would not expect that policy to bar coverage for events that "one would not ordinarily characterize . . . as pollution." *Id.* at 124, 127. The court gave examples of events that would not ordinarily be characterized as pollution, including "the release of carbon monoxide from a small business owner's delivery truck," "'a slip and fall on the spilled contents of a bottle of Drano,'" or "'bodily injury caused by an allergic reaction to the chlorine in a public pool.'" *Id.* at 124 (quoting *Pipefitters Welfare Educ. Fund. v. Westchester Fire Inc. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)). Some "limiting principle" was necessary because a broad reading of total pollution exclusion clauses would lead to "absurd results." *Id.*

The *Doerr* Court instructed that whether a total pollution exclusion applies turns on the following considerations:

> (1)     Whether the insured is a "polluter" within the meaning of the exclusion;
>
> (2)     Whether the injury-causing substance is a "pollutant" within the meaning of the exclusion; and

> (3)     Whether there was a "discharge, dispersal, seepage, migration, release or escape" of a pollutant by the insured within the meaning of the policy.

*Id.* at 135.  The court emphasized the fact-intensive nature of this inquiry:

> First, the determination of whether an insured is a "polluter" is a fact-based conclusion that should encompass consideration of a wide variety of factors.  In making this determination, the trier of fact should consider the nature of the insured's business, whether the type of business presents a risk of pollution, whether the insured has a separate policy covering the disputed claim, whether the insured should have known from a read of the exclusion that a separate policy covering pollution damages would be necessary for the insured's business, who the insurer typically insures, any other claims made under the policy, and any other factor the trier of fact deems relevant to this conclusion . . . .

> Second, the determination of whether the injury-causing substance is a "pollutant" is also a fact-based conclusion that should encompass a wide variety of factors.  As pointed out above, there are a variety of substances that could fall within the broad definition of irritants and contaminants as provided in this policy.  For example, under pollution exclusions similar to the one at issue here, courts have found "pollutant" to include everything from asbestos, carbon monoxide, gasoline, lead paint, and some pesticides; on the other hand, some courts have found that "pollutants" do not include muriatic acid, styrene resins, and other forms of pesticide.  Consequently, when making this determination, the trier of fact should consider the nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor the trier of fact deems relevant to that conclusion.

> Finally, the determination of whether there was "discharge, dispersal, seepage, migration, release or escape" is likewise a fact-based conclusion that must result after a consideration of all relevant circumstances.  Specifically, the trier of fact should consider whether the pollutant was intentionally or negligently discharged, the amount of the injury-causing substance discharged, whether the actions of the alleged polluter were active or passive, and any other factor the trier of fact deems relevant.  These factual conclusions should be made to assist a court in determining whether the total pollution exclusion in any particular case will exclude coverage for a claim.

*Id.* at 135–36 (internal citations omitted).

Subsequent case law indicates that a lengthy analysis of these factors is not required if the type of "pollution" alleged is so far removed from the type of "environmental pollution" contemplated by *Doerr* that the policy's total pollution exclusion obviously does not apply.  In *Gaylord Container Corp. v. CNA Ins. Cos.*, 807 So.2d 864 (La. App. 1st Cir. 2001), for example, a Louisiana appellate court concluded that a total pollution exclusion in the plaintiff's general liability policies did not exclude coverage for an explosion that occurred when a railcar filled with nitrogen tetroxide, which the plaintiff had ordered for use in its chemical production business, exploded on the way to the factory.  The plaintiff sought coverage for the many personal injury suits.  Noting the statement in *Doerr* that total pollution exclusion clauses applied to "environmental pollution only," the court concluded that it was "unnecessary to engage in an extensive analysis of the *Doerr* three-step inquiry."  *Id.* at 872.  The court reasoned that the plaintiff was not seeking a defense or indemnity "for suits that relate to environmental cleanup claims arising out of the" explosion, but instead for personal injury claims arising out of the accident.  *Id.*  The *Gaylord* case emphasized that under *Doerr*, pollution exclusion clauses would not be applied to "exclude coverage for routine accidents" or "fortuitous event[s] such as an explosion," that "incidentally involved a chemical agent."  *Id.*

Similarly, in *Smith v. Reliance Co. of Illinois*, 807 So.2d 1010, 1013 (La. App. 5th Cir. 2002), a Louisiana appellate court concluded that a total pollution exclusion did not bar coverage for personal injury claims against a wastewater treatment plant for the accidental release of hydrogen sulfide and "noxious odors" for a discrete period as a result of a faulty mechanical aerating pump and abnormally high amounts of sugar in the waste water.  The claims included "respiratory and eye problems, headaches, nausea, sleeplessness, diarrhea and rashes."  *Id.* at 1015.  Citing *Doerr* for the

propositions that "the general purpose of the pollution exclusion clause is to exclude coverage for environmental pollution," and that such clauses must not be "read strictly to exclude coverage for all interactions with irritants or contaminants at any time," the court concluded that "the record fails to support the application of the factors enunciated by *Doerr* to the facts of this case." *Id.* at 1019–020.

In *State Farm and Casualty Co. v. M.L.T. Construction Co.*, 849 So.2d 762, 771 (La. App. 4th Cir. 2003), the court observed that *Doerr* solidified "a fairly consistent line of jurisprudence in Louisiana." One such pre-*Doerr* case, which *State Farm* cited with approval, vacated a summary judgment in favor of the insurer, which had invoked a pollution exclusion clause to deny coverage for injuries sustained by a city investigator injured when he inhaled pesticide fumes that had leaked from insecticide containers warehoused at the insured's facility. *West v. Bd. of Comm'rs*, 591 So.2d 1358, 1360 (La. App. 4th Cir. 1991). The *West* court, noting that "the exclusion is applicable to 'polluters'—those who indifferently pollute our environment—and not to those who only incidentally possess the pollutant in the course of their other business," remanded for trial on whether the exclusion applied. *Id.* at 1360–61.

Cases in other jurisdictions that have applied *Doerr* have reached similar results. In *Gainsco Insurance Co. v. Amoco Production Co.*, 53 P.3d 1051, 1056 (Wy. 2002), for example, the insurer invoked a total pollution exclusion clause as a basis for denying coverage for an employee's death from exposure to poisonous hydrogen sulfide gas while emptying a vacuum truck in an oil field. The Wyoming Supreme court, citing *Doerr* for the proposition that an "absolute pollution exclusion [is] not intended to exclude coverage for all interactions with irritants or contaminants and should be construed to exclude coverage only for environmental pollution," concluded that "[w]e cannot believe that any person in the position of the insured would understand the word "pollution" in this exclusion

37

to mean anything other than environmental pollution." The court concluded that the exclusion did not apply. *Id.* at 1065–66.

By contrast, *Grefer v. Travelers Insurance Co.*, 919 So.2d 758 (La. App. 5th Cir. 2005), which Liberty Mutual cites, provides an example of an incident sufficiently related to "environmental pollution" to require consideration of the *Doerr* factors. The insured, an oilfield pipe-cleaning, storage, and trucking operator, was sued by the owners of the land it had leased for twenty-four years for its business. Four years after the lease expired and the insured vacated the land, the landowners discovered that the land had been contaminated during the lease by waste products from the insured's pipe-cleaning business. The contaminants included barium sulfate, strontium sulfate, calcium sulfate, calcium carbonate, and radium sulfate, some of which were radioactive. There was evidence that these waste products were "blown into the air," "mixed with soil," and "used to fill holes all over the property at least twice per week" while the insured occupied the land. *Id.* at 769. The appellate court reversed the trial court's conclusion that the total pollution exclusions contained in the insured's general liability policies did not apply. Applying the *Doerr* factors, the appellate court concluded that the insured was a "polluter" because the cleaning of the oilfield pipes, which produced the waste products, was the insured's business, and because the insured's method of handling those waste products created a strong risk of pollution. *Id.* The court concluded that the radioactive waste products were "clearly" pollutants. *Id.* at 771. The waste products were generated on a "massive" scale and "released on to the ground and then dispersed throughout" the property. The court emphasized the fact that the dispersal was "active, purposeful and intended." *Id.* at 772.

Liberty Mutual also cites *Pro-Boll Chemical & Fertilizer Co.*, No. 01-1531, 2004 WL 3494045, at *7 (W.D. La. 2004). In *Pro-Boll*, the plaintiff owned a pesticide storage facility. The soil underneath the facility had become contaminated over fourteen years by pesticide that leaked

from storage tanks the defendants built. The leakage required removing 165 tons of pesticide-contaminated soil and additional investigation and cleanup. The district court concluded that the total pollution exclusion in the insured's general liability policy applied. The court concluded that the plaintiff, a pesticide dealer, applicator, and producer, was a "polluter"; the pesticide that leaked was a "pollutant"; and the soil and groundwater contamination showed a "discharge, dispersal, seepage, migration, release, or escape." *Id.* The court concluded: "[t]he purpose of the pollution exclusion (to strengthen environmental protection standards by imposing the full risk of loss due to personal injury or property damage from pollution upon the polluter by eliminating the option of spreading that risk through insurance coverage) [w]as fulfilled through application to the facts of this case." *Id.*

The evidence shows that the chemical-exposure incident in this case is more similar to the isolated, limited events found not to exclude coverage in *Gaylord*, *Smith*, and *West* than to the systematic, long-term environmental pollution that triggered the exclusions in *Grefer* and *Pro-Boll*. The release of the W.O. Break at issue was a one-time, discrete, sudden accident. Jones sustained the only injury. The release was in a limited and confined area. There is disputed evidence in the record that the W.O. Break was being used for its intended purpose—which ADTI's Darrell Miller contends included cleaning oil-based drilling fluid—even if it was poured into the wrong vessel. There is no evidence that the W.O. Break came into contact with the water or land around RIG 46, and no environmental cleanup or reporting was required. This is not a case in which the surrounding land and water became contaminated after an extended period of release or dispersal. Applying the post-*Doerr* case-law, the Total Pollution Exclusion does not apply.

The *Doerr* factors confirm this result. The issue of whether the third-party defendants are "polluters" cuts both ways. The oil and gas industry requires the use of numerous chemicals that are

considered "pollutants," and these chemicals are "the very nature of [that] business." *Grefer*, 919 So.2d at 771.  There is evidence that some of the subcontractors carried separate pollution insurance policies and that TODCO has reported incidents of environmental pollution.  But there is also undisputed evidence that RIG 46 was a "zero discharge" operation.  There is no indication that the third-party plaintiffs' handling of chemicals on RIG 46 "created a strong risk of pollution." *Id.*  The third-party plaintiffs concede that W.O. Break is a "pollutant," at least in some contexts.  But there was no "discharge, dispersal, seepage, migration, release or escape" similar to that present in the cases finding that a policy's pollution exclusion applies.  There is no indication that the W.O. Break reached any area beyond the enclosed vessel within RIG 46 or that it caused any negative effects beyond the injury to Jones.  *Cf. Lumbermens Mut. Cas. Co. v. S-W Indus., Inc.*, 39 F.3d 1324 (6th Cir. 1994) ("The fumes and dust that injured [the employee] . . . were confined inside [the] plant and, in fact, were confined to that portion of that plant involved in the gluing process in which [the employee] worked.  It strains the plain meaning, and obvious intent, of the language to suggest that these fumes, as they went from the container from to [the employee's] lungs, had somehow been "discharged, dispersed, released, or escaped. . . . Without belaboring the obvious, we hold that this exclusion is intended to shield the insurer from the liabilities of the insured to outsiders, either neighboring landowners or governmental entities enforcing environmental laws, rather than injuries caused by toxic substances that are still confined within the area of their intended use.").

Under the *Doerr* factors, the Total Pollution Exclusion does not apply.  The Total Pollution Exclusion does not provide a basis for Liberty Mutual to deny coverage under the CGL Policy.

### E.      The Third-Party Plaintiffs Did Not Violate the Duty to Cooperate

Liberty Mutual contends that it is not required to provide coverage because the third-party plaintiffs failed to cooperate in defending Jones's claim.  This argument fails.  Under the Louisiana

law that applies to the CGL Policy, once an insurer has denied coverage, it may no longer rely on the insured's compliance with policy conditions. *See Copelin v. State Farm Ins. Co.*, No. 06-4115, 2009 WL 361088, at *5 (E.D. La. Feb. 12, 2009) ("[W]hen an insurer denies liability for a claim, it abandons its right to compel the claimant to comply with the preliminary provisions of the policy." (quoting *Patterson v. Liberty Lloyds Ins. Co.*, 692 So.2d 17, 19 (La. App. 4th Cir. 1997)); *Mosedegh v. State Farm Fire & Cas. Co.*, No. 4544361, 2008 WL 4544361, at *3 (E.D. La. Oct. 8, 2008). The third-party plaintiffs' asserted failure to cooperate does not provide a basis to deny coverage.

The MSA applied to the work that Francis Drilling was performing on RIG 46. The MSA is governed by maritime law, under which its indemnification provisions are valid. The CGL Policy requires Liberty Mutual to insure the third-party plaintiffs as additional insureds and to provide indemnification to Francis Drilling to fulfill Francis Drilling's obligations under the MSA. The Total Pollution Exclusion and the third-party plaintiffs' alleged failure to cooperate do not bar coverage.

## IV.   Damages

The parties paid Jones $145,000 in settlement. Liberty Mutual advanced $55,000, Francis Drilling advanced $65,000, and the third-party plaintiffs advanced $25,000. The parties have stipulated that the third-party plaintiffs incurred $125,000 in attorneys' fees defending against Jones's claim, and an additional $151,072 in fees pursuing their indemnification claims against Liberty Mutual and Francis Drilling. Liberty Mutual and Francis Drilling do not dispute the reasonableness of the fees but vigorously dispute the third-party plaintiffs' entitlement to a fee award. The parties have also stipulated that the third-party plaintiffs incurred $14,035 in expenses defending against Jones's claim, and an additional $10,931.42, plus trial fees and expenses, pursuing their indemnification claims against Liberty Mutual and Francis Drilling.

41

**A.      Liberty Mutual and Francis Drilling are Liable for the Fees and Expenses the Third-Party Plaintiffs Incurred Defending Against Jones's Claim**

This court has found and concluded that Francis Drilling's indemnification obligation to the third-party plaintiffs under the MSA is valid and that Liberty Mutual is required to provide coverage to the third-party plaintiffs as additional insureds and to Francis Drilling to support the MSA indemnification obligation.  The MSA provides that Francis Drilling will "release, protect, indemnify, defend (including payment of reasonable attorney's fees and costs of litigation) and hold [ADTI and its subcontractors] harmless from any and all . . . claims . . . in favor of . . . [Francis Drilling] employees . . . on account of . . . bodily injury."  (TODCO Trial Binder, Ex. 7 § 9.1).  The MSA provides indemnification for "reasonable attorney's fees and costs of litigation" incurred defending against a bodily injury claim by one of Francis Drilling's employees.  The parties have already stipulated to the reasonableness of the attorneys' fees.  The litigation costs, including the expenses for electronic legal research, are reasonable for a claim of this nature.  The third-party plaintiffs are entitled to the $125,000 in attorneys' fees and $14,035 in expenses incurred defending against Jones's claim.

**B.      Liberty Mutual and Francis Drilling are Not Liable for the Fees and Expenses the Third-Party Plaintiffs Incurred Pursuing Indemnification**

The third-party plaintiffs do not dispute that under settled Louisiana law, Liberty Mutual is not directly liable for the attorneys' fees the third-party plaintiffs incurred to establish coverage under the CGL Policy as additional insureds.  Under Louisiana law, which governs the CGL Policy, a party is not entitled to attorneys' fees incurred in pursuing coverage unless a statute or the policy itself provides for such fees.  *See Steptore v. Masco Constr. Co.*, 643 So.2d 1213, 1218 (La. 1994) ("[T]he insurance contract did not impose a duty on the insurer to pay attorney's fees in connection with the insured's pursuit of the coverage issue. . . . Generally, if the insured hires an attorney to represent him

42

in coverage disputes, he will have to bear those costs himself."); *Henry's Marine Serv., Inc. v. Fireman's Fund Ins. Co.*, No. 02-3682, 2004 WL 1146066, at *1 (E.D. La. 2004) ("It is well-established Louisiana law that an insured may not recover attorneys' fees in connection with insurance coverage litigation unless a statute or the insurance contract specifically provides for them."); *Dowden v. Leebo's Stores, Inc.*, 877 So.2d 353, 356 (La. App. 3d Cir. 2004) ("Generally, an insured can recover attorney fees associated with its defense of the underlying action, but not with its litigation of the coverage issue."); 15 LA. CIV. L. TREATISE, INSURANCE LAW & PRACTICE § 215 (3d ed. 2007) ("[A]bsent contractual or statutory duty, the insurer has no duty to pay attorney's fees in connection with the insured's pursuit of coverage issues, including defense costs.").

The third-party plaintiffs do not argue that Liberty Mutual has a contractual duty under the CGL Policy to pay the attorneys' fees the third-party plaintiffs incurred in litigating coverage. Nor do the third-party plaintiffs assert that Liberty Mutual has a statutory duty.[21] But the third-party plaintiffs contend that Francis Drilling is liable under the MSA for the attorneys' fees the third-party plaintiffs incurred in establishing an indemnification obligation under the MSA.

The MSA provides:

> Subcontractor shall at all times be responsible for and shall release, protect, indemnify, defend (including payment of reasonable attorney's fees and costs of litigation) and hold contractor group harmless from and against any and all costs, losses, liabilities, claims, demands, causes of action, damages, penalties, judgments and awards of every kind and character, without limit and without regard to the cause or causes thereof or the negligence or fault of any party or parties (including without limitation the active, passive, concurrent or

---

[21] Louisiana does have a penalty statute that permits an insured to recover "fifty percent of damages on the amount found to be due from the insurer to the insured" plus "reasonable attorney fees and costs" if an insurer "is found to be arbitrary, capricious, or without probable cause" in denying a claim. LA. REV. STAT. 22:1892(B)(1). The burden is on the insured to establish that the insurer acted arbitrarily and capriciously. *See Chevalier v. Reliance Ins. Co. of Ill.*, 953 F.2d 877, 883 (5th Cir. 1992); *Yount v. Lafayette Ins. Co.*, 4 So.3d 162, 172 (La. App. 4th Cir. 2009). The third-party plaintiffs have not raised the penalty statute.

> solely negligent acts or omissions of any member of Contractor
> Group) arising in connection herewith.

(TODCO Trial Binder, Ex. 7 § 9.1).  The CGL Policy insures Francis Drilling for liability for "bodily injury" that Francis Drilling is "legally obligated to pay" as a result of obligations assumed in an "insured contract."  (*Id.*, Ex. 19 at 2 and endorsement 26).  Whether the CGL Policy provides coverage for attorneys' fees and expenses incurred in litigating the indemnification obligation under the MSA turns on whether Francis Drilling is "legally obligated to pay" such fees and expenses under the MSA.

The MSA is governed by maritime law.  Under maritime law, "[a] contract of indemnity includes the obligation to pay the costs and attorneys' fees of the indemnitee against the third party, but not the right to costs and fees in connection with establishing the right to indemnification unless expressly stated."  1 THOMAS J. SCHOENBAUM ET AL., ADMIRALTY AND MARITIME LAW § 5-20 (4th ed. 2003); *see also Nathaniel Shipping, Inc. v. Gen. Elec. Co. v. La. Gulf Shipyards, Inc.*, 920 F.2d 1256, 1268 (5th Cir. 1991) (Under maritime law, "indemnification for attorney's fees [ar]e recoverable as foreseeable damages . . . for the costs of defending against a claim by a third party," but are not presumed to "extend to recovery of fees for litigation against the party in breach to actually determine liability.").

The third-party plaintiffs concede that they have not located cases with indemnification clauses identical to the MSA clause at issue.  Most of the cases the third-party plaintiffs cite are inapposite because they do not arise under maritime law and apply a different test.  *See, e.g., Naquin v. La. Power & Light Co.*, 951 So.2d 228, 231–32 (La. App. 1st Cir. 2006) (applying Louisiana law and concluding that because the indemnification language was general and indefinite, the court could consider evidence of the parties' intent in determining whether there was coverage for fees incurred

44

seeking to establish or enforce indemnity); *Carrier v. La. Pigment Co.*, 846 So.2d 803, 810 (La. App. 3d Cir. 2003) (applying Louisiana law); *Montgomery Ward & Co. v. Wetzel*, 423 N.E. 2d 1170, 1177–78 (Ill. App. 1981) (applying Illinois law in indemnification agreement involving tax overpayments); *Hammond v. Travelers Indem. Co.*, 553 S.W.2d 205, 206 (Tex. Civ. App.–Houston [14th Dist.] 1977, no writ) (applying Texas law).

One case involving an indemnity clause similar to that in the MSA is *Peter Fabrics, Inc. v. S.S. Hermes*, 765 F.2d 306 (2d Cir. 1985).  The indemnity clause in the maritime contract involved in that case stated:

> [Italian Line] will defend, indemnify and hold harmless [Massport] from and against all claims, causes of action, suits, losses, damages, liabilities and expenses, including but not limited to cost of suit and attorneys' fees, based on or arising from the acts or omission of [Italian Line] . . . which arise out of or in any way relate to [Italian Line's] use of or presence at the facility.

*Id.* at 313.  The court observed that attorneys' fees incurred in pursuing indemnity obligations are not awarded, absent an express contractual provision, because such fees "are not by their nature a part of the claim indemnified against," but instead are "costs incurred in suing for a breach of contract, to wit, the failure to indemnify."  *Id.* at 316.  The court concluded that the phrase "including but not limited to cost of suit and attorneys' fees" was "more naturally construed as referring to legal expenses incurred in defending against the primary claim.  Merely including the words 'attorneys' fees' among the expenses indemnified against in the main action cannot reasonably be viewed as causing a shifting of fees in an action to establish the obligation to indemnify."  *Id.*  This case supports a conclusion that the indemnity clause in the MSA does not support the third-party plaintiffs' argument that they are entitled to recover the fees they incurred in litigating the indemnity obligation.

45

The third-party plaintiffs also contend that the words "hold harmless" show the parties' intention that indemnitees under the MSA are not required to pay any money in enforcing their indemnification rights.  But the Fifth Circuit has rejected using clauses with "hold harmless" language as a basis for awarding attorneys' fees incurred in pursuing indemnification.  In *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984), for example, the court concluded that a clause stating,  "Contractor shall protect, indemnify, and save Company harmless from and against all claims, demands, and causes of action of every kind and character (including cost of defense) for injury to or death of all persons who are not employees of Company," did not require the Contractor to pay the Company the fees it incurred pursuing indemnification.

The third-party plaintiffs also cite *Dillingham Shipyard v. Associated Insulation Co.*, 649 F.2d 1322 (9th Cir. 1981), as an example of a case in which a maritime indemnity contract was construed as providing a basis to award attorneys' fees incurred in pursuing indemnification.  But the relevant contract language in that case was broader than the indemnity language in the MSA.  The clause in *Dillingham* stated: "Subcontractor shall save harmless Contractor from all attorneys' fees, costs and expenses of whatsoever kind or nature which are in any manner directly or indirectly caused, occasioned or contributed to in whole or in part, through any act, omission, fault or negligence whether active or passive of Subcontractor."  *Id.* at 1328.  By contrast, while the MSA indemnity clause refers to attorneys' fees and costs, it is in the context of discussing the exposures that might arise from the primary claim, not from a failure to indemnify for that claim.

The rule under maritime law is that attorneys' fees for the prosecution of indemnification agreements are not available unless the agreement expressly provides.  There is no express statement in the MSA providing indemnity for pursuing the indemnity obligation.  As in *Hermes*, the wording of the MSA, which refers to indemnification for work done "in connection [ ]with" Francis Drilling's

work for ADTI, is "more naturally construed as referring to legal expenses incurred in defending against the primary claim." 765 F.2d at 316. The third-party defendants may not recover their attorneys' fees incurred in pursuing indemnification under the MSA.

### C.     Liberty Mutual and Francis Drilling are Not Entitled to Indemnification From BJ Services and Baker Hughes

Liberty Mutual and Francis Drilling have cross-claimed against BJ Services and Baker Hughes for indemnity and insurance, contending that Jones's accident was an event of "pollution" for which these parties must provide indemnity under their respective MSAs with ADTI. The ADTI/BJ Services and ADTI/Baker Hughes MSAs are substantially similar to the ADTI/Francis Drilling MSA. All provide that the subcontractors will indemnify ADTI and its other subcontractors, as follows:

> Subcontractor shall at all times be responsible for, shall release, and shall indemnify, defend (including payment of reasonable attorneys' fees and costs of litigation) and hold contractor group harmless from and against any and all costs (including without limitation, costs of investigation, litigation, and court costs), interest, losses, liabilities, claims, demands, causes of action, damages, penalties, suits (including appeal), judgments, fines, expenses (including without limitation reasonable attorneys' fees) and awards of every kind and character (collectively, "claims"), arising in connection herewith:
>
> (a)     In favor of . . . the officers, directors, employees, agents, consultants, servants, representatives or invitees of subcontractor group on account of sickness, personal or bodily injury, death or damage to, loss of use of, or loss of their property; and/or
>
> . . . .
>
> (c)     [P]ollution or contamination (including without limitation the control and/or removal thereof) which originates from subcontractor's equipment, the equipment of subcontractor's subcontractors or materials under the control of subcontractor or subcontractor's subcontractors, including but not limited to fuels, lubricants, motor oils, pipe dope, paints, solvents, garbage or debris . . . .

47

(TODCO Trial Binder, Ex. 7 § 9.1(c), Ex. 9 § 9.1(c), Ex. 10 § 9.1(c)).  The MSAs do not define "pollution."

Liberty Mutual and Francis Drilling contend that ADTI's MSAs with BJ Services and Baker Hughes are governed by Texas law, which broadly construes total pollution exclusion clauses in insurance contracts.  Liberty Mutual and Francis Drilling argue that the "pollution or contamination" provisions in the ADTI MSAs with BJ Services and Baker Hughes should be broadly applied, requiring BJ Services and Baker Hughes to indemnify ADTI for Jones's injury.  (Docket Entry No. 206 at 47–53).  Liberty Mutual and Francis Drilling do not explain why Texas law governs these MSAs.  Nor do they explain why Texas law construing total pollution exclusions in insurance contracts should be applied with equal force to the "pollution or contamination" provision in indemnity contracts such as the MSAs.  Under Texas law, which Liberty Mutual and Francis Drilling contend controls, the party seeking indemnification has the burden of proving that the obligation is present if it is contested.  *See Utica Nat'l Ins. Co. v. Am. Indemnity*, 141 S.W.3d 198, 203 (Tex. 2004); *Hettler v. Travelers Lloyds Ins. Co.*, 190 S.W.3d 52, 58 (Tex. App.–Amarillo 2005).  Liberty Mutual and Francis Drilling have not met this burden.

The Texas total pollution exclusion clause cases that Liberty Mutual and Francis Drilling cite, *Certain Underwriters at Lloyd's London v. C.A. Turner Construction Co.*, 112 F.3d 184, 186 (5th Cir. 1997), and *United National Insurance Co. v. Motiva Enterprises, LLC.*, No. H-04-2924, 2006 WL 83482, at *10 (S.D. Tex. 2006), are also distinguishable.  Both involved pollution exclusion clauses that excluded coverage for both "bodily injury" and "property damage."  In both cases, the court concluded that the respective CGL Policies did not cover bodily injury resulting from the pollution.  By contrast, the "pollution or contamination" clauses in the ADTI MSAs do not specifically list "bodily injury" as a type of pollution claim for which indemnification is required.  The MSAs do

48

specifically list pollution "control" and "removal" as claims for which indemnification is required. The MSAs list "bodily injury" in a different indemnification clause, which requires each subcontractor to indemnify ADTI and the other subcontractors for "bodily injury" claims by the subcontractor's own employees.   Although the "pollution or contamination" clause does not specifically exclude indemnification for "bodily injury"—the clause states that it covers claims "including without limitation the control, and/or removal" of pollution or contaminants—the structure of the MSAs makes clear that "bodily injury" and pollution "control" and "removal" are two distinct concepts carrying two distinct indemnification obligations.  The holdings of *C.A. Turner* and *Motiva*, which involved pollution exclusion clauses that specifically included bodily injury, do not control here.

The Fifth Circuit in *C.A. Turner* also stressed that a "common-sense approach" should be used in determining whether a pollution exclusion clause applies:

> The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property. Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*C.A. Turner*, 112 F.3d at 188 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)).  The Fifth Circuit indicated that in many cases, a pollution exclusion clause should not apply when "the damage-causing incident involve[d] a commonly used chemical," or whether "only a slight amount of substance [wa]s released."  *Id.*  In *C.A. Turner*, the

49

release of gas that triggered the pollution exclusion clause was "substantial," filling a "temporary plastic tent that enclosed scaffolding intended to support at least three people" so densely that the injured worker "couldn't see a hand in front of [his] face." *Id.* In *Motiva*, the workers were exposed to such high levels of hydrogen sulfide gas that they "suffered severe brain damage" and were "permanently disabled." 2006 WL 83482, at *2. The record shows that Jones was exposed to the fumes from approximately three gallons of sodium hypochlorite solution while in a confined area small enough that he could barely stand.  The record indicates that Jones was told that he could return to regular duties on the same day as the accident and that he was treated with over-the-counter medications.  The record does not contain evidence of extensive injury to Jones.  There was no property damage.  No environmental cleanup was required.  Liberty Mutual and Francis Drilling have not presented evidence or arguments showing that this would constitute "pollution," even under Texas law.

The record also does not support the cross-claim against Baker Hughes because there is insufficient evidence that the W.O. Break was under Baker Hughes's control at the time of the accident.  Baker Hughes's MSA with ADTI requires indemnification only for pollution caused by "materials under the control of subcontractor."  (TODCO Binder, Ex. 9 ¶ 9.1(c)).  B.J. Services's filtration technician, Paul Domingues, testified that he poured the W.O. Break into the "possum belly" of the shaker at the suggestion of a Baker Hughes employee, Justin Knox.  But Knox testified that he never told Domingues to use the W.O. Break in that way.  Another witness, ADTI's Darrell Miller, testified that W.O. Break would be used in the sand traps and mud pits, not in the possum belly.  The record does not support a finding that Baker Hughes controlled the release of W.O. Break into the "possum belly."

### D.     Liberty Mutual and Francis Drilling Must Pay Defense Costs Incurred Before the Date of Tender

Liberty Mutual contends that it is not required to pay the defense costs the third-party plaintiffs incurred before tendering their claims for defense and indemnity under the CGL Policy. Liberty Mutual cites cases applying Texas law.  But this court has already concluded that the CGL Policy is governed by Louisiana law.  Under Louisiana law, "the duty to defend arises when the insurer receives notice of the litigation.  Delayed notice of a claim relieves the insurer of the obligation [only] if it was actually prejudiced by the delay." *Rovira v. LaGoDa, Inc.*, 551 So.2d 790, 794 (La. App. 5th Cir. 1989) (permitting recovery of attorneys' fees incurred before notice was given because the insurer "ha[d] not shown that it was prejudiced by the 20-day lapse"); *see also Pomares v. Kansas City So. Ry. Co.*, 474 So.2d 976, 978 (La. App. 5th Cir. 1985) ("[A]n insurer may not raise the nonprejudicial failure of the insured to give proper notice of suit as a defense to valid claims by a third party.").  No particular form of notice is required.  "[A]s long as the insurer receives sufficient information to act on the claim, the manner in which it obtains the information is immaterial." *Tracy v. Travelers Ins. Cos.*, 594 So.2d 541, 545 (La. App. 5th Cir. 1992) (citing *Sevier v. U.S. Fidelity & Guar. Co.*, 497 So.2d 1380, 1384 (La. 1986)).

The record shows that Liberty Mutual received notice of the claim for defense against Jones's suit before August 24, 2007.  On that date, Liberty Mutual's chief examiner wrote to counsel for ADTI stating that she had been forwarded a July 26, 2007 letter from ADTI's counsel to counsel for Francis Drilling requesting defense and indemnification from Francis Drilling and Liberty Mutual; that she had reviewed Jones's complaint, the MSA, and the CGL Policy; and that Liberty Mutual "ha[d] no duty" and "decline[d] to defend" ADTI or its subcontractors.  (TODCO Trial Binder, Ex. 23).  Liberty Mutual does not argue, and has offered no evidence, that it was prejudiced by any delay

51

in receiving notice of the suit.  In any event, the fees incurred before Liberty Mutual received notice are relatively minimal.  The third-party plaintiffs incurred 13.1 hours of fees before receiving Liberty Mutual's August 24, 2007 letter, approximately half of which were spent pursuing the third-party plaintiffs' right to defense and indemnity.  (*Id.*, Ex. 28).  This court has already disallowed fees incurred pursuing defense and indemnification.

The date that notice of the defense and indemnification claim was tendered does not affect the third-party plaintiffs' recovery of attorneys' fees.

### E.    Apportionment

Liberty Mutual and Francis Drilling argue that any recovery should be apportioned among the third-party plaintiffs, according to fault.  Liberty Mutual, through its indemnification obligations to Francis Drilling, and its additional insured obligations to the third-party plaintiffs, is liable for the $125,000 in fees and $14,035 in costs that the third-party plaintiffs incurred defending against Jones's claim.  Liberty Mutual has already paid $55,000 of the settlement and must reimburse the third-party plaintiffs for the $25,000 that they advanced.  By **August 31, 2009**, the third-party plaintiffs must file a proposed order with this court that stipulates how the amount they are entitled to recover from Liberty Mutual will be divided.

## V.    Conclusions of Law

- Francis Drilling is required to indemnify the third-party plaintiffs under its MSA with ADTI.

- The CGL Policy that Francis Drilling obtained from Liberty Mutual provides coverage for the indemnification owed the third-party plaintiffs, and that coverage is not barred by the Total Pollution Exclusion in the CGL Policy.  The third-party plaintiffs are entitled to coverage as additional insureds under the CGL Policy.

- BJ Services and Baker Hughes are entitled to indemnification by ADTI under their MSAs with ADTI.

- Liberty Mutual and Francis Drilling are not entitled to indemnification by BJ Services and Baker Hughes based on the "pollution or contamination" clause in the MSAs between BJ Services and ADTI and Baker Hughes and ADTI.

- Liberty Mutual and Francis Drilling are not liable for the fees and expenses that the third-party plaintiffs incurred pursuing their indemnification claims.

- Liberty Mutual and Francis Drilling are liable for a total of $164,035, including the $25,000 that the third-party plaintiffs advanced to settle Jones's claim and the $125,000 in attorneys' fees and $14,035 in expenses that the third-party plaintiffs incurred defending against Jones's claim.

## VI.    Order

Liberty Mutual and Francis Drilling are required to insure and indemnify the third-party plaintiffs under the MSA.  BJ Services and Baker Hughes are entitled to recover on their cross-claim against ADTI for indemnification under their MSAs.   Liberty Mutual and Francis Drilling are not entitled to recover on their cross-claim against BJ Services and Baker Hughes under the "pollution or contamination" provision in the MSAs with ADTI.  Liberty Mutual and Francis Drilling are not liable for fees and expenses that the third-party plaintiffs incurred in pursuing their indemnification obligations.  By August 31, 2009, the third-party plaintiffs must file a statement with this court stating

how their $164,035 total recovery from Liberty Mutual will be divided and, if appropriate, submitting a proposed final judgment.

SIGNED on July 29, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

54